## FEDERAL MARITIME COMMISSION v. SEATRAIN LINES, INC., ET AL.

No. 71–1647.   Argued March 21, 1973—Decided May 14, 1973

MARSHALL, J., delivered the opinion for a unanimous Court.

*Edward G. Gruis* argued the cause for petitioner. With him on the briefs was *David Fisher.*

*Irwin A. Seibel* argued the cause for respondents. With him on the brief for the United States were *Solicitor General Griswold, Assistant Attorney General Kauper,* and *William Bradford Reynolds.   Marvin J. Coles, Neal M. Mayer,* and *G. Brockwel Heylin* filed a brief for respondent Seatrain Lines, Inc.   *Odell Kominers* and *Richard S. Salzman* filed a brief for respondents Pacific Far East Line, Inc., et al.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Section 15 of the Shipping Act, 1916, 39 Stat. 733, as amended, 46 U. S. C. § 814, requires all persons subject to the Act to file with the Federal Maritime Com-

*Lawrence E. Walsh, William F. Ragan,* and *Guy Miller Struve* filed a brief for R. J. Reynolds Tobacco Co. as *amicus curiae.*

mission [1] every agreement within specified categories reached with any other person subject to the Act. The section further empowers the Commission to disapprove, cancel, or modify any such agreement which it finds to be unjustly discriminatory, to the detriment of the commerce of the United States, contrary to the public interest, or violative of the terms of the Act.[2] The Commission is

---

[1] Originally, the Shipping Act conferred jurisdiction on the United States Shipping Board. See 39 Stat. 728, 729, 733. Over the years, the jurisdiction here at issue has been shifted to the United States Shipping Board Bureau of the Department of Commerce, see Exec. Order No. 6166, § 12 (1933), the United States Maritime Commission, see 49 Stat. 1985, the Federal Maritime Board, see 64 Stat. 1273, and finally, the Federal Maritime Commission, see 75 Stat. 840. For convenience, we will follow the practice of the parties and the court below and refer throughout to the "Commission."

[2] Section 15 provides in pertinent part:

"Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements.

"The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be con-

directed to approve all other agreements, and the statute expressly provides that agreements so approved are exempt from the antitrust laws.[3]

The question presently before us is whether a contract which calls for the acquisition of all the assets of one carrier by another carrier and which creates no ongoing obligations is an "agreement" within the meaning of this section. The question is of some importance, since if such contracts are not approved by the Commission, the antitrust laws are fully applicable to them. See *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213 (1966). Cf. *United States* v. *Borden Co.,* 308 U. S. 188 (1939). But cf. *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474 (1932); *Far East Conference* v. *United States,* 342 U. S. 570 (1952). On the other hand, if they are within the Commission's jurisdiction, the Commission may approve them even though they are violative of the antitrust laws, although the Commission must take antitrust principles into account in reaching its decision. See *Volkswagenwerk Aktiengesellschaft* v. *FMC,* 390 U. S. 261, 273–274 (1968);

---

trary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. . . .

.     .     .     .     .

"Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission . . . ."

[3] Section 15 provides that "[e]very agreement, modification, or cancellation lawful under this section . . . shall be excepted from the provisions of sections 1 to 11 and 15 of Title 15, and amendments and Acts supplementary thereto." Since the Act makes lawful those agreements approved by the Commission, its effect is to vest the Commission with the power to shield those agreements approved by it from antitrust attack. See *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213, 216 (1966). But cf. *FMC* v. *Aktiebolaget Svenska Amerika Linien,* 390 U. S. 238, 242–246 (1968).

*FMC* v. *Aktiebolaget Svenska Amerika Linien,* 390 U. S. 238, 244–246 (1968).

In this case, the Court of Appeals for the District of Columbia Circuit concluded that § 15 did not confer jurisdiction upon the Commission to approve discrete acquisition-of-assets agreements. In so holding, it followed a prior District Court decision in *United States* v. *R. J. Reynolds Tobacco Co.,* 325 F. Supp. 656 (NJ 1971), but declined to follow a Ninth Circuit holding that the Commission had such jurisdiction. See *Matson Navigation Co.* v. *FMC,* 405 F. 2d 796 (CA9 1968). We granted certiorari in order to resolve this conflict and because the case posed an important issue concerning the interface between the antitrust laws and the Commission's regulatory powers. We conclude that in enacting § 15, Congress did not intend to invest the Commission with the power to shield from antitrust liability merger or acquisition-of-assets agreements which impose no ongoing responsibilities. Rather, Congress intended to invest the Commission with jurisdiction over only those agreements, or those portions of agreements, which created ongoing rights and responsibilities and which, therefore, necessitated continuous Commission supervision. We therefore affirm the judgment below.

I

This case was initiated when respondent Seatrain Lines, Inc. (Seatrain) filed a protest with the Commission against an agreement reached between Pacific Far East Lines, Inc. (PFEL) and Oceanic Steamship Co. (Oceanic), both of which are also respondents here, whereby Oceanic agreed to sell all its assets to PFEL. Under the terms of the agreement, Oceanic promised to transfer its entire fleet and all the related equipment together with Oceanic's interest in two container ships then being constructed and all of Oceanic's employees to

PFEL. Although Oceanic did not formally merge with PFEL and retained its corporate existence, it was left as a shell corporation wholly without assets. However, Oceanic undertook no continuing obligation not to re-enter the business and compete with PFEL. On October 6, 1970, Oceanic and PFEL notified the Commission of the agreement, but accompanied the notification with an express statement that, in their view, the agreement was not within the Commission's jurisdiction. The Commission published notice of the agreement, see 35 Fed. Reg. 16114, and allowed 10 days for interested parties to protest and request a hearing. Seatrain filed such a request on October 21, 1970, alleging that it was a potential competitor of PFEL and that the acquisition agreement would have anticompetitive consequences and, hence, was contrary to the public-interest standard of the statute.

Instead of holding a hearing to investigate these allegations, however, the Commission issued a summary order denying the request for an investigation and approving the agreement. The Commission held that "[w]hile section 15 of the Shipping Act, 1916, requires notice and opportunity for hearing, prior to agreement approval, there is no requirement of law that the mere filing of a protest is sufficient to require that a hearing be held before the Commission may grant approval of any protested agreement." Finding that "the likelihood of any impact at all upon [Seatrain's] operations which might result from approval of the agreement is a matter of mere speculation," the Commission concluded that "Seatrain has no standing in this matter, and that its protest is without substance." [4]

---

[4] In light of our holding that the Commission lacked jurisdiction over this agreement, we do not decide whether the Commission's decision that Seatrain was not entitled to a hearing would have been proper in a case in which the Commission properly asserted

After Seatrain's petition to reopen was denied, it appealed the Commission's ruling to the Court of Appeals.[5] Seatrain argued that the Commission was required to hold a hearing on its objection, while the United States, as statutory respondent,[6] and Oceanic and PFEL, as intervenors, argued that the Commission lacked jurisdiction over the agreement. In a comprehensive opinion, the Court of Appeals found it unnecessary to reach the hearing issue, since it found that the Commission "lacks jurisdiction under Section 15 of the Shipping Act, 1916, to approve arrangements of the type involved here, which do not require the continued existence or participation of the parties in such arrangements." 148 U. S. App. D. C. 424, 441, 460 F. 2d 932, 949 (1972). The Court therefore vacated the Commission's decision and directed that the agreement be removed from its docket. The case then came here on the Commission's petition for certiorari. 409 U. S. 1058 (1972).

## II

At the outset, it must be recognized that the statutory language neither clearly embraces nor clearly excludes discrete merger or acquisition-of-assets agreements. The situation is therefore fundamentally different from that posed in *Volkswagenwerk Aktiengesellschaft* v. *FMC*, relied upon heavily by petitioner, where we held in the context of an ongoing agreement that the Commission's ruling that the agreement was without its § 15 jurisdiction "simply does not square with the structure of the statute." 390 U. S., at 275. In this case, the statute is ambiguous in its scope and must therefore be read in

jurisdiction. Cf. *Marine Space Enclosures, Inc.* v. *FMC*, 137 U. S. App. D. C. 9, 420 F. 2d 577 (1969).

[5] Direct appeal to the Court of Appeals of final orders of the Commission is authorized by 28 U. S. C. § 2342 (3).

[6] See 28 U. S. C. § 2344.

light of its history and the governing statutory presumptions.

By its terms, the statute requires those covered by it to "file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement . . . or modification or cancellation thereof" which falls into any one of seven categories. These are agreements

> "[1] fixing or regulating transportation rates or fares; [2] giving or receiving special rates, accommodations, or other special privileges or advantages; [3] controlling, regulating, preventing, or destroying competition; [4] pooling or apportioning earnings, losses, or traffic; [5] allotting ports or restricting or otherwise regulating the number and character of sailings between ports; [6] limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; [7] or in any manner providing for an exclusive, preferential, or cooperative working arrangement."

None of these seven categories expressly refers to a one-time merger or acquisition-of-assets agreement which imposes no continuing obligation and which, indeed, effectively destroys one of the parties to the agreement. The Commission vigorously argues that such agreements can be interpreted as falling within the third category—which concerns agreements "controlling, regulating, preventing, or destroying competition." [7] Without more, we might be inclined to agree that many merger agreements prob-

---

[7] The Commission's position in this regard is not without irony. In denying Seatrain's application for a hearing and approving the agreement, the Commission held that Seatrain had failed to make sufficient allegations to show that the acquisition of assets would be destructive of competition. Yet the Commission now contends that it had jurisdiction over the agreement because it was one "preventing" competition.

ably fit within this category. But a broad reading of the third category would conflict with our frequently expressed view that exemptions from antitrust laws are strictly construed, see, *e. g., United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305, 316 (1956), and that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350-351 (1963) (footnotes omitted). As we observed only recently: "When . . . relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws." *Otter Tail Power Co.* v. *United States,* 410 U. S. 366, 374 (1973). See also *Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963); *Pan American World Airways, Inc.* v. *United States,* 371 U. S. 296 (1963); *California* v. *FPC,* 369 U. S. 482 (1962); *United States* v. *Borden Co.,* 308 U. S. 188 (1939). This principle has led us to construe the Shipping Act as conferring only a "limited antitrust exemption" in light of the fact that "antitrust laws represent a fundamental national economic policy." *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S., at 219, 218.[8]

Our reluctance to construe the third category of agreements broadly so as to include discrete merger arrangements is bolstered by the structure of the Act. It should be noted that of the seven categories, six are expressly

---

[8] It is true that "antitrust exemption results, not when an agreement is submitted for filing, but only when the agreement is actually approved." *Volkswagenwerk Aktiengesellschaft* v. *FMC,* 390 U. S. 261, 273 (1968). But the fact remains that an expansive reading of the Commission's jurisdiction would increase the number of cases subject to potential antitrust immunity.

limited to ongoing arrangements in which both parties undertake continuing responsibilities. Indeed, even the third category refers to agreements "controlling," "regulating" and "preventing" competition—all of which are continuing activities. Only the reference to the destruction of competition supports the Commission's argument that the provision was intended to cover one-time, discrete transactions. But even this reference must be read in light of the final, comprehensive category which refers to agreements "in any manner providing for an exclusive, preferential, or cooperative working arrangement." As the Court of Appeals noted, this last category was clearly meant as a catchall provision, "intended . . . to summarize the type of agreements covered." 148 U. S. App. D. C., at 427, 460 F. 2d, at 935. Cf. *FMB* v. *Isbrandtsen Co.,* 356 U. S. 481, 492 (1958). It is, of course, a familiar canon of statutory construction that such clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated. See 2 J. Sutherland, Statutes and Statutory Construction § 4908 *et seq.* (3d ed. 1943) and cases there cited. Since the summary provision is explicitly limited to "*working* arrangement[s]" (emphasis added), it is reasonable to conclude that Congress intended this limitation to apply to the specifically enumerated categories as well.[9]

This reading of the statute is especially compelling in light of the rest of the statutory scheme, which simply does not make sense if the statute is read to encompass one-time agreements creating no continuing obligations. For example, the statute directs the Commission to "dis-

---

[9] The statute itself provides no definition of the term "agreement" beyond the statement that "[t]he term 'agreement' in this section includes understandings, conferences, and other arrangements." Although certainly not dispositive, it is at least worthy of note that these synonyms given for "agreement" are all evocative of ongoing activity.

approve, cancel or modify any agreement . . . *whether or not previously approved by it,* that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter" (emphasis added).   The statute thus envisions a continuing supervisory role for the Commission and invests it with power to disallow an agreement after a period of time even though it had initially been permitted.   But it is hard to see how the Commission can exercise this supervisory function when there are no continuing obligations to supervise.   And we think it unlikely that Congress intended to permit the Commission to approve acquisition-of-assets agreements, allow them to go into effect, and then, sometime in the indefinite future, resuscitate the expired company and unscramble the assets under its continuing power to disapprove agreements previously approved.

Similarly, the provision in the Act which provides that "[t]he Commission shall disapprove any . . . agreement . . . on a finding of inadequate policing of the obligations under it" makes no sense unless the agreements create continuing obligations to police.   The statutory requirement that "continued approval" shall not be permitted for agreements "between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreement between conferences, each conference, retains the right of independent action," suggests an ongoing relationship between the contracting parties.   And the requirement that the contracting parties "adopt and maintain reasonable procedures for promptly and fairly

hearing and considering shippers' requests and complaints" can only be understood in the context of a continuing relationship between the contracting parties.

In short, while the statute neither expressly includes nor expressly excludes one-time acquisition-of-assets arrangements, the words must be read in context, and the context makes undeniably clear the ongoing, supervisory role which the Commission was intended to perform. As the Court of Appeals concluded, "[t]he whole structure of Section 15, not only the first paragraph listing the type agreement covered, shows an intent to grant the Commission authority to deal with agreements of a continuing nature." 148 U. S. App. D. C., at 427, 460 F. 2d, at 935.

### III

This construction of the Shipping Act is strongly supported by the legislative history of the Act and by Congress' treatment of other industries in contemporaneous and related statutes. As this Court recognized in *FMB* v. *Isbrandtsen Co.,* 356 U. S., at 490, most of the legislative history of the Act is contained in the so-called Alexander Report which culminated a comprehensive investigation into the shipping industry by the House Committee on the Merchant Marine and Fisheries chaired by Congressman Alexander. See House Committee on the Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H. R. Doc. No. 805, 63d Cong., 2d Sess. (1914) (hereinafter Alexander Report). Although legislation designed to carry out the Report's recommendations initially failed to pass, see H. R. 17328, 63d Cong., 2d Sess., a substantially similar bill was enacted in the next Congress and was clearly intended to write the Alexander proposals into law. See H. R. Rep. No. 659, 64th Cong., 1st Sess., 27; S. Rep. No. 689, 64th Cong., 1st Sess., 7.

After examining some 80 steamship agreements and conference arrangements, the Alexander Committee concluded that "practically all the established lines operating to and from American ports work in harmonious cooperation, either through written or oral agreements, conference arrangements, or gentlemen's understandings." Alexander Report 281. The Committee found that this network of agreements, many of them secret, provided a comprehensive system for fixing rates and suppressing competition. See *id.,* at 282–295. As the Committee described the resulting competitive structure of the industry,

> "The primary object of [the] conferences and agreements is to prevent new lines from being organized in a trade and to crush existing lines which refuse to comply with conditions prescribed by the combination, or which, for other reasons, are not acceptable as members of the conference. The methods which have been adopted from time to time to eliminate competition show the futility of a weak line attempting to enter a trade in opposition to the combined power of the established lines when united by agreement. By resorting to the use of the 'fighting ship,' or to unlimited rate cutting, the conference lines soon exhaust the resources of their antagonists. By distributing the loss resulting from the rate war over the several members of the conference, each constituent line suffers proportionately a much smaller loss than the one line which is fighting the entire group. Moreover, the federated lines can conduct the competitive struggle with the comfortable assurance that, following the retirement of the competing line, they are in a position to reimburse themselves through an increase in rates. To allow conferences, therefore, generally means giving the trade to the lines now enjoying it. Only a powerful

line can hope to fight its way into the trade, and with the inevitable result, if successful, that it will join the combination or be allowed to exist by virtue of some rate understanding." Alexander Report 304–305.

Yet despite these findings, the Committee decided against recommending the outright banning of the conference system. Instead, it chose to place that system under government supervision and to invest an administrative agency with the power to approve or disapprove various conference arrangements. The Committee's reasons for this decision are crucial to the issue presently before us. The Committee found that:

"[O]pen competition can not be assured for any length of time by ordering existing agreements terminated. The entire history of steamship agreements shows that in ocean commerce there is no happy medium between war and peace when several lines engage in the same trade. Most of the numerous agreements and conference arrangements discussed in the foregoing report were the outcome of rate wars, and represent a truce between the contending lines. To terminate existing agreements would necessarily bring about one of two results: the lines would either engage in rate wars which would mean the elimination of the weak and the survival of the strong, or, to avoid a costly struggle, they would consolidate through common ownership. Neither result can be prevented by legislation, and either would mean a monopoly fully as effective, and it is believed more so, than can exist by virtue of an agreement." *Id.*, at 416.

Thus, the Committee chose to permit continuation of the conference system, but to curb its abuses by requiring government approval of conference agreements. It did

so because it feared that if conferences were abolished, the result would be a net decrease in competition through the mergers and acquisition-of-assets agreements that would result from unregulated rate wars. It is readily apparent that the Commission's reading of the statute would frustrate this legislative purpose. The Committee gave the Commission power to insulate certain anticompetitive arrangements in order to prevent outright mergers. Yet the Commission would have us construe this authority in such a way as to allow it to shield the mergers themselves—the very thing which Congress intended to prevent. Cf. *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S., at 218–220.

The illogical nature of the Commission's argument is especially apparent when one remembers that at the time the Act was passed, the Commission was arguably not permitted to take antitrust policies into account when ruling on proposed agreements. We have construed the "public interest" standard contained in the Act as requiring the Commission to consider the antitrust implications of an agreement before approving it. See *Volkswagenwerk Aktiengesellschaft* v. *FMC,* 390 U. S., at 274 n. 20; *FMC* v. *Aktiebolaget Svenska Amerika Linien,* 390 U. S., at 242–244. Cf. *Mediterranean Pools Investigation,* 9 F. M. C. 264, 289 (1966). But the "public interest" criterion was not added to the Act until 1961. See 75 Stat. 763. Thus, under the petitioner's interpretation, at the time the Act was passed, the Commission was arguably required to approve merger agreements despite strong antitrust objections to them if the other criteria of the Act were met. We simply cannot believe that Congress intended to require approval of the very arrangements which, as the legislative history clearly shows, it wanted to prevent.

The legislative history also demonstrates that the Alexander Committee used the term "agreements" as

a word of art and that mergers and other arrangements creating no continuing rights and obligations were not included within its definition. As the District Court in *United States* v. *R. J. Reynolds Tobacco Co.* observed,

"The catalog or 'full classification of these agreements' (i. e., the 'agreements' to which the Alexander Committee's attention was primarily directed and to which its recommendations were exclusively directed) does not include a single agreement of merger or other form of corporate reorganization. The 'agreements' represented in the Report are all 'on-going' in nature. Most of these 'agreements' are cooperative working arrangements. These 'agreements' describe practices or regular activities in which two or more shipping companies have agreed to participate over a considerable period of time. None of the 'agreements' studied by the Alexander Committee bears the slightest resemblance to an agreement of merger, which is essentially a single, discrete event, which transforms the relationship of the merging parties at the instant of merger." 325 F. Supp., at 658–659 (footnotes omitted).[10]

---

[10] The *Reynolds* court's observations were directed at the Committee's study of foreign trade. In this context, the Committee found that competition was largely frustrated by extensive use of conference arrangements. When the Committee turned to domestic trade, it found that "[u]nlike the practice of water carriers in the foreign trade of the United States, agreements to divide the territory or charge certain rates in the domestic trade are few." Alexander Report 421. Rather, in the domestic arena, the Committee found that competition was controlled largely through mergers, chiefly between railroads and water carriers. The Commission argues from this fact that Congress intended merger agreements to be filed, since the legislation which was ultimately enacted made no distinction between foreign and domestic trade. But throughout the Report whenever the Committee referred to mergers and acquisitions, it distinguished sharply between them and agreements, for which the filing

Moreover, in the few places where the Committee did discuss mergers, it distinguished sharply between such arrangements and the ongoing agreements to which its recommendations were directed. For example, in summarizing its findings the Committee wrote:

> "The numerous methods of controlling competition between water carriers in the domestic trade, referred to in the preceding pages, may be grouped under three headings, viz, (1) control through the *acquisition* of water lines or the *ownership* of accessories to the lines; (2) control through *agreements* or *understandings;* and (3) control through *special practices.*" Alexander Report 409 (emphasis added).

As the *Reynolds* court concluded,

> "Consistently throughout the Report, mergers and other corporate reorganizations, when occasionally mentioned, are referred to by the terms 'consolidation by ownership' and 'control through acquisition,' or variations thereof. Never is the word 'agreement' used in the Report to refer to a merger agreement.

---

and approval mechanism was applicable. See the discussion in text. Cf. Note, The Shipping Industry Seeks a Safe Haven: Merger Jurisdiction for the FMC?, 5 Law & Pol. Int'l Bus. 274, 285–286 (1973). Moreover, a careful reading of the Report makes clear that the Committee envisioned other devices for .controlling the mergers prevalent in the domestic field. Thus, the Committee noted that the Panama Canal Act of 1912, 49 U. S. C. § 5 (14), already prohibited railroads from owning or controlling water carriers, see *infra,* at 742, and observed that this requirement went "far toward eliminating some of the undesirable practices which were found by the Committee to exist in the domestic commerce of the United States." Alexander Report 422. While the Committee made other recommendations with respect to domestic carriers, these merely paralleled its foreign recommendations and, hence, pertained to "agreements" and "arrangements" rather than "mergers" and "acquisitions" which it thought were sufficiently regulated by existing legislation. See *id.,* at 422–424.

It is clear that the Alexander Committee distinguished conceptually between agreements in the sense of on-going, cooperative agreements and agreements of 'consolidation' or 'acquisition' (of which merger agreements are a form)." 325 F. Supp., at 659 (footnotes omitted).

Finally, an examination of contemporaneous and related statutes makes clear that when Congress intended to bring acquisitions and mergers under control, it did so in unambiguous language. For example, only a few years prior to passage of the Shipping Act, Congress expressly dealt with mergers involving water carriers. In the Panama Canal Act, 49 U. S. C. § 5 (14), Congress provided that:

"[I]t shall be unlawful for any carrier [as defined in the Interstate Commerce Act] . . . to own, lease, operate, control, or have any interest whatsoever (by stock ownership or otherwise, either directly indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water operated through the Panama Canal or elsewhere with which such carrier aforesaid does or may compete for traffic or any vessel carrying freight or passengers upon said water route or elsewhere with which said railroad or other carrier aforesaid does or may compete for traffic."

Similarly, when Congress meant to require agency approval for mergers and acquisitions, it did so unambiguously. Thus, the Interstate Commerce Act, 49 U. S. C. § 5 (2)(a)(i) authorizes the Interstate Commerce Commission to give its approval "for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties

theretofore in separate ownership." In the same manner, the Federal Communications Act, 47 U. S. C. § 222 (b)(1) provides:

"It shall be lawful, upon application to and approval by the [Federal Communications] Commission as hereinafter provided, for any two or more domestic telegraph carriers to effect a consolidation or merger; and for any domestic telegraph carrier, as a part of any such consolidation or merger or thereafter, to acquire all or any part of the domestic telegraph properties, domestic telegraph facilities, or domestic telegraph operations of any carrier which is not primarily a telegraph carrier."

Examination of the Federal Aviation Act is particularly instructive in this regard. Title 49 U. S. C. § 1382 (a) requires air carriers to file with the Civil Aeronautics Board for prior approval

"every contract or agreement . . . for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, . . . or otherwise eliminating destructive, oppressive, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working arrangements."

This provision closely parallels § 15 of the Shipping Act, and was obviously modeled after it. Yet Congress clearly thought the provision insufficient to bring discrete merger and acquisition agreements within the Civil Aeronautics Board's jurisdiction, since it enacted another, separate provision requiring Board approval when air carriers "consolidate or merge their properties." 49 U. S. C. § 1378 (a)(1).[11]

---

[11] The Commission would have us infer that the 1916 Act conferred jurisdiction upon it from an amendment added in 1950 to § 7 of

## IV

In light of these specific grants of merger approval authority, we are unwilling to construe the ambiguous provisions of § 15 to serve this purpose—a purpose for which it obviously was not intended. As the Court of Appeals found, the House Committee which wrote § 15 "neither sought information nor had discussion on ship sale agreements. They were neither part of the problem nor part of the solution." 148 U. S. App. D. C., at 432, 460 F. 2d, at 940. If, as petitioner contends, there is now a compelling need to fill the gap in the Commission's reg-

the Clayton Act, 15 U. S. C. § 18, as amended by 64 Stat. 1125, 1126. As amended, the provision specifies that:

"Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Civil Aeronautics Board, Federal Communications Commission, Federal Power Commission, Interstate Commerce Commission, the Securities and Exchange Commission . . . the United States Maritime Commission, or the Secretary of Agriculture."

As is clear from the face of the statute, the Act confers no new jurisdiction on any of the listed agencies, but merely provides that mergers already exempt from Clayton Act coverage were to be unaffected by changes in the Act. As this Court held in *California v. FPC*, the amended § 7 was "plainly not a grant of power to adjudicate antitrust issues." 369 U. S. 482, 486 (1962). Hence, nothing about the Commission's jurisdiction can be inferred from the inclusion of its predecessor on the list. This view is confirmed by the legislative history of the 1950 amendment. Although acceding to the Commission's request that it be included in the list of agencies left unaffected by the Clayton Act, see Letter of Grenville Mellen, Vice Chairman, United States Maritime Commission, to Senator Herbert O'Conor, Chairman, Senate Subcommittee to consider H. R. 2734, Sept. 29, 1949, reprinted in Brief for Petitioner 52–54, the Committee made explicit that "[i]n making this addition . . . it is not intended that the Maritime Commission, or, for that matter, any other agency included in this category, shall be granted any authority or powers which it does not already possess."    S. Rep. No. 1775, 81st Cong., 2d Sess., 7 (1950).

ulatory authority, the need should be met in Congress where the competing policy questions can be thrashed out and a resolution found. We are not ready to meet that need by rewriting the statute and legislative history ourselves.

But the Commission contends that since it is charged with administration of the statutory scheme, its construction of the statute over an extended period should be given great weight. See, *e. g., NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111 (1944). This proposition may, as a general matter, be conceded, although it must be tempered with the caveat that an agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate. In this case, however, there is a disjunction between the abstract principle and the empirical data. The court below made a detailed study of the prior Commission cases relied upon by petitioner to bolster its interpretation of the statute and concluded that none of them involved assertion of jurisdiction over a case such as this, where the agreement in question imposed no ongoing obligations. We find it unnecessary to decide whether every prior case decided by the Commission can be reconciled with our opinion today. It is sufficient to note that the cases do not demonstrate the sort of longstanding, clearly articulated interpretation of the statute which would be entitled to great judicial deference, particularly in light of the clear indications that Congress did not intend to vest the Commission with the authority it is now seeking to assert. As this Court held in a related context,

> "The construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.' . . . But the courts are the final authorities on issues of

statutory construction, *FTC* v. *Colgate-Palmolive Co.*, 380 U. S. 374, 385, and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' *NLRB* v. *Brown*, 380 U. S. 278, 291." *Volkswagenwerk Aktiengesellschaft* v. *FMC*, 390 U. S., at 272.

In this case, we find that the Commission overstepped the limits which Congress placed on its jurisdiction. The judgment of the Court of Appeals must therefore be

*Affirmed.*