**MIREE CONSTRUCTION CORPORA-TION, Plaintiff–Appellant,**

v.

**Elizabeth DOLE, Secretary of United States Department of Labor, Defendant–Appellee.**

No. 90–7143.

United States Court of Appeals, Eleventh Circuit.

May 13, 1991.

Braxton Schell, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff-appellant.

Linda Carol Arnold, Atty., U.S. Dept. of Labor, Washington, D.C., Frank W. Donaldson, U.S. Atty., D. Wayne Rogers, Jr., Asst. U.S. Atty., Birmingham, Ala., for defendant-appellee.

Terry R. Yellig, Nora H. Leyland, Sherman, Dunn, Cohen, Leifer & Yellig, Washington, D.C., John L. Quinn, Longshore, Nakamura & Quinn, Birmingham, Ala., amicus curiae.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

KRAVITCH, Circuit Judge:

The Davis–Bacon Act requires contractors working on federally funded construction projects to pay their employees a wage that is not less than the prevailing wage for similarly situated employees in the locality. This wage can be paid in cash or in a combination of cash and fringe benefits. Miree Construction Corporation made certain contributions to a fringe benefit plan and took credit for these contributions when calculating its wage obligations under the Act. A Department of Labor Wage and Hour Division Administrator found that Miree's contributions to the plan were excessive and therefore Miree could not credit all the contributions toward its prevailing wage obligations. A divided Wage Appeals Board affirmed the Administrator, and the district court affirmed the Wage Appeals Board.

## I. Background

Miree Construction Corporation worked on three construction projects in 1984 and 1985 that were subject to the wage determinations of the Davis–Bacon Act (the "Act"), codified at 40 U.S.C. §§ 276a–276a–5.[1] Under the Act, contractors working on federally funded construction projects must pay their employees a wage that is not less than the prevailing wage in the locality for corresponding classes of employees. *See* 40 U.S.C. § 276a(a). An employee's wage,

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. On the three projects, Miree worked on five contracts. On one of the projects, Miree's wages were also subject to the Housing and Community Development Act of 1974, codified at 42 U.S.C. §§ 5301–20. The provision of the Housing and Community Development Act at issue states that employers must pay wages in accordance with the Davis–Bacon Act. *See* 42 U.S.C. § 5310. Thus, we need only discuss whether or not a violation of the Davis–Bacon Act occurred.

for purposes of the Act, is the total of all cash wages and non-cash fringe benefits paid by the contractor to the employee. Specifically, the Act provides:

(b) As used in sections 276a to 276a–5 of this title the term "wages", "scale of wages", "wage rates", "minimum wages", and "prevailing wages" shall include—

(1) the basic hourly rate of pay; and

(2) the amount of—

(A) *the rate of contribution irrevocably made* by a contractor or subcontractor *to a trustee or to a third person pursuant to a fund, plan, or program;* and

(B) *the rate of costs* to the contractor or subcontractor *which may be reasonably anticipated in providing benefits to laborers and mechanics pursuant to an enforcible [sic] commitment to carry out a financially responsible plan or program* which was communicated in writing to the laborers and mechanics affected,

for medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, for unemployment benefits, life insurance, disability and sickness insurance, or accident insurance, for vacation and holiday pay, *for defraying costs of apprenticeship* or other similar programs, or for other bona fide fringe benefits, but only where the contractor or subcontractor is not required by other Federal, State, or local law to provide any of such benefits.

(emphasis added).

During its work on the Davis–Bacon projects, Miree paid cash wages to its employees and also made contributions to an apprenticeship program operated by the Associated Builders and Contractors of Alabama, Inc. (the "ABC plan"). The ABC plan is approved by the Department of Labor's Bureau of Apprenticeship and Training and is authorized to provide training in fourteen trades. The plan bills contractors $500.00 for tuition and books for each of the contractor's apprentices trained. Miree had one employee enrolled in the plan as an apprentice carpenter during the time Miree worked on the Davis–Bacon projects. Rather than pay the $500.00 fee, however, Miree made contributions into the plan of $.25 for each hour worked by Miree's carpenters, bricklayers, and laborers. These contributions totalled $11,293.52. Miree counted these $.25 per hour contributions as fringe benefits for the purpose of complying with the Act's prevailing wage requirements.

A Department of Labor Wage and Hour Division Administrator investigated Miree's contributions and disallowed most of the contributions. The Administrator stated that the Davis–Bacon Act only allowed Miree to receive credit for $500.00, the actual cost of enrolling Miree's one apprentice carpenter in the ABC plan. Furthermore, in determining the amount per hour that Miree could credit toward its prevailing wage obligations, the Administrator applied the "annualization principle." Under this principle, when converting the $500.00 into an hourly amount, the $500.00 was divided by the total number of working hours in the year, not just those hours spent working on Davis–Bacon projects. Finally, the Administrator allowed Miree a credit for the hourly amount only for its carpenters, not for its bricklayers and laborers. The Administrator reasoned that costs incurred for training one classification of employees could not be credited for meeting the prevailing wage requirements of another classification. In light of these determinations, the Administrator instructed the United States Army, the agency that had hired Miree, to withhold funds that were due Miree.

Miree appealed the decision of the Administrator to the Wage Appeals Board (the "Board"). In lieu of a hearing before an administrative law judge, Miree submitted ten stipulations of fact to which the Administrator responded. The Wage Appeals Board then made its determination based on the administrative record compiled to that point, plus the stipulations.

The Board affirmed the decision of the Administrator.

In its appeal to the Board, Miree made three arguments as to why it should be allowed to claim credits for the total amount it paid into the ABC plan. First, Miree argued that the $.25 per hour payments were a "contribution" irrevocably made to a trustee of an approved plan, and therefore were allowable under section 276a(b)(2)(A). Miree contended that union contractors are allowed credits under this section, and Miree, a non-union contractor, had made payments in an amount consistent with payments considered reasonable when made by unions. Second, Miree argued that application of the annualization principle results in de facto government regulation of private construction contracts that were never intended to be covered by the Act. Third, Miree argued that its contributions should be allowed for all of its job classifications, not just the carpenter who was involved in the apprenticeship program. Miree claimed that as for its bricklayers, union contractors' contributions are routinely allowed as credits even though the union contractor may not have any apprentices enrolled at a given time. As for laborers, there is no statutory basis for excluding contributions made for the laborer classification. Furthermore, not to allow the contributions discriminates against non-union contractors because their employees frequently do different jobs while working on the same project, unlike union workers, who work only in one craft.

The opinion of the Board was written by Member Dunn, who affirmed the decision of the Administrator. Member Rothman concurred, and Chairman Andrews dissented. Dunn first distinguished between "funded" plans under subparagraph (A) of the statute and "unfunded" plans under subparagraph (B) of the statute. According to Dunn, a funded plan is a plan provided for in a collective bargaining agreement. An unfunded plan, according to Dunn, is a plan not provided for in a collective bargaining agreement. Dunn concluded that Miree's contributions of $.25 per hour could not be considered contributions to a funded plan because they were not made "*pursu-

*ant* to a fund, plan, or program"—the ABC plan did not require contributions of $.25 per hour, but rather required only a payment of $500.00 for each employee enrolled. *See* Wage Appeals Board Decision at 9 (R. 323) (emphasis original). Thus, rather than examining Miree's "rate of contribution" to a funded plan, Dunn assessed Miree's "rate of costs" to an unfunded plan. Dunn interpreted "rate of costs" to mean the actual costs paid by Miree into the ABC plan, in this case $500.00.

Dunn next addressed the issue of annualization. Dunn agreed with the Administrator that the annualization principle must be applied to Miree's payments into the ABC plan. As mentioned above, the annualization principle requires that when converting an employer's contribution to a plan into an hourly amount, the amount of payments must be divided by the total number of hours worked in a year, not just the number of hours worked on Davis–Bacon projects. Dunn reasoned that this principle prevents employers from receiving credit toward their Davis–Bacon wage obligations for compensation actually provided during non–Davis–Bacon work.

Lastly, Member Dunn addressed whether or not Miree could receive credit toward its wage obligations to its bricklayers and laborers when it did not have any bricklayers or laborers enrolled in the ABC plan. Dunn agreed with the Administrator that Miree could not make payments for training one class of workers and take credit for those payments against its wage obligations to other classes. Miree had argued that this rule discriminated against non-union contractors because non-union employees often move from one job classification to another during a given project. Although admitting that this was a "close question," *see* Wage Appeals Board Decision at 14 (R. 328), Dunn found that this argument was not persuasive because the ABC plan did not train cross-craft workers, and therefore Miree's employment practice was inconsistent with the structure of the plan.

Member Rothman "reluctantly" concurred in the result reached by Member

Dunn, stating that he felt he had to concur because he believed the Board should reach a plurality decision, and because he felt that by affirming the Administrator he was avoiding a "retroactive shift in policy." Wage Appeals Board Decision at 15–16 (R. 329–30). Rothman then went on to list ten considerations that should be taken into account when determining wage credits in the future. In these considerations, he addressed the issues raised by Miree. He stated that when a prevailing wage rate is based on cash and fringe benefit packages used in collective bargaining agreements, there is no reason to disallow contributions made by non-union contractors when they are no higher than those made by union contractors. As to the annualization principle, he saw nothing in the Act requiring contractors to make contributions for all work during the year, including non-government projects, rather than just work covered by the Act. Finally, he saw no reason to prohibit credit for contributions for workers who perform more than one craft. The contributions would simply have to be adjusted to an amount commensurate with the amounts used for each craft in their respective collective bargaining agreements. In sum, Member Rothman basically disagreed with everything in Member Dunn's opinion, but felt that to reverse the Administrator would result in a retroactive shift in policy, albeit a policy that he believed was unwarranted under the Act.

Chairman Andrews agreed with Member Dunn that the annualization principle is not unfair to non-union contractors, and that annualization is the appropriate way to calculate credits. As to the other two issues, however, Chairman Andrews disagreed. He found that Dunn's distinction between funded and unfunded plans was irrelevant. He stated that the reason for having the two separate provisions in the Act was merely to take into account the wide variety of fringe benefit plans to which contractors could contribute. Thus, as long as bona fide contributions are made, either subparagraph allows for credit.

After finding that the funded/unfunded distinction was irrelevant, Chairman Andrews addressed Miree's argument that it should receive credit for all of its contributions to the ABC plan, not just its actual costs of training the one carpenter that was enrolled in the plan. He agreed with Miree. He noted that unions often contribute more or less than the exact amount of their costs of training at any particular point in time. Thus, to limit Miree to its actual costs is to treat union and non-union contractors differently, a result not warranted under the Act. Furthermore, although Chairman Andrews agreed with the Administrator that Miree should not receive credit toward its obligations to its laborers, the fact that no bricklayers were using the plan did not preclude Miree from taking credit for its contributions for its bricklayers. In his view, as long as the contributions were reasonably made to a certified plan, the contractor could claim the credit. Chairman Andrews therefore recommended that the case be remanded to the Administrator to determine whether or not $.25 per hour was a reasonable amount to contribute to the ABC plan, and if so, to apply the annualization principle to that amount.

Based on the above background, the district court affirmed the decision of the Board. The district court, applying the Administrative Procedure Act, see 5 U.S.C. § 706, held that it could only reverse the decision of the Board if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The district court stated that although the Members of the Board had reached a "slightly confusing" result, based on the variance in their opinions, the court still was obligated to defer to the decision of an agency interpreting a statute with which it has expertise. Thus, because there was a rational basis for the Board's decision, the district court affirmed. 730 F.Supp. 385 (1990).

## II. Standard of Review

■ Although the parties agree that the three issues before us are questions of law, they disagree over the amount of deference we must give to the decision of the Wage Appeals Board. In *Chevron, U.S.A., Inc.*

*v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court made clear that when reviewing ambiguous statutory language, courts generally should defer to agency interpretations of statutes that they administer: "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Id.* at 844, 104 S.Ct. at 2782. The Supreme Court also has held, however, that reviewing courts should not blindly defer to agency interpretations, and that the amount of deference warranted in a particular case "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *see also Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981); *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 573, 54 L.Ed.2d 538 (1978); *Frank Diehl Farms v. Secretary of Labor,* 696 F.2d 1325, 1330 (11th Cir.1983). Thus, an agency decision is more likely to be entitled to deference if it is a "longstanding, clearly articulated interpretation of the statute." *Federal Maritime Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620 (1973).

In this case, the district court referred to the Wage Appeals Board decision as "slightly confusing." District Court Order at 24. In fact, the opinions of the Board members and the Administrator are vastly divergent. The Administrator argued to the Board that the ABC plan was a funded plan. Statement for the Administrator at 6 (R. 59). Member Dunn found that the plan was not a funded plan. Member Rothman did not address the issue, and Chairman Andrews addressed the issue but found it to be irrelevant. As to the issue of the creditable amount of Miree's contributions, the Administrator limited the amount to $500.00. Dunn agreed with this amount,

although he relied on the funded/unfunded distinction to arrive at this result. Rothman reluctantly concurred, but stated that in the future non-union contractors should be allowed credit for reasonable contributions. Chairman Andrews dissented based on reasoning similar to Rothman's. As to the cross-craft training issue, Dunn again agreed with the Administrator. Chairman Andrews disagreed as to bricklayers, but agreed as to laborers. Rothman, although concurring in Dunn's result, stated that future cases should be resolved the other way. He made no distinction between bricklayers and laborers. The only issue that produced any semblance of a consensus was the issue of annualization. On that issue, Member Dunn and Chairman Andrews agreed with the Administrator. Member Rothman concurred but saw no basis for reaching such a result in the future.

■ In light of the conflicting views expressed by the Administrator and the members of the Board, we cannot simply defer to the result reached by the Board. Judicial review requires a court to evaluate the reasoning of the administrative agency. *See Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164. Therefore, although we look to the various opinions of the Board members and the Administrator for the persuasiveness of their reasoning, our review must be de novo.

### III. Creditable Contributions to a Plan

■ The Davis–Bacon Act has two provisions under which an employer can receive credit for fringe benefit payments: (1) "[T]he rate of contribution irrevocably made ... to a trustee or to a third person pursuant to a fund, plan, or program," *see* 40 U.S.C. § 276a(b)(2)(A), or (2) "[T]he rate of costs ... which may be reasonably anticipated in providing benefits ... pursuant to an enforcible [sic] commitment to carry out a financially responsible plan or program...." *See* 40 U.S.C. § 276a(b)(2)(B). Member Dunn found that the ABC plan was an "unfunded" plan under subparagraph (B). Miree argues that the ABC plan is a "funded" plan under subpara-

graph (A), but also states, as does the Department of Labor, that the distinction between a funded and unfunded plan is irrelevant for purposes of our inquiry.

The statute does not explain the difference between "rate[s] of contribution" to funded plans and "rate[s] of costs" to unfunded plans. The legislative history addresses this issue only briefly. The legislative history states the following with regard to funded plans:

> [T]hese contributions must be irrevocable and they must be made pursuant to a fund, plan, or program. While it was not the desire of the committee to impose specific standards relating to the administration of the plans it is expected that the majority of plans of this nature will be those which are administered in accordance with the requirements of section 302(c)(5) of the National Labor Relations Act, as amended. Among other things, therefore, the contributions would have to be placed with a trustee or third person who could not later be required to return them to the contractor or subcontractor making the contributions. This will help insure the bona fides of the plan, fund, or program, and protect and preserve the interest of the beneficiaries in them. The phrase "plan, fund, or program" is merely intended to recognize the various types of arrangements commonly used to provide fringe benefits through employer contributions.

S.Rep. No. 963, 88th Cong., 2d Sess. (1964), *reprinted in* 1964 U.S.Code Cong. & Admin.News 2339, 2343–44. As for unfunded plans, the legislative history states:

> No type of fringe benefit would be eligible for consideration as a so-called unfunded plan (sec. 1(b)(2)(B) of the bill) unless—
>
> (a) It was of a type that could be reasonably anticipated to provide benefits similar to those enumerated in the bill;
>
> (b) It represented a commitment that could be legally enforced;
>
> (c) It could be carried out under a financially responsible plan or program; and

> (d) The plan or program providing the benefits was communicated in writing to the laborers and mechanics affected.
>
> It is in this manner that the bill provides for the consideration of unfunded plans or programs in finding prevailing wages and in ascertaining compliance with the act. At the same time, however, there is protection against the use of this provision as a means of avoiding the act's requirements. The words "reasonably anticipated" are intended to require that any unfunded plan or program be able to withstand a test which can perhaps be best described as one of actuarial soundness. Moreover, as in the case of other fringe benefits payable under the act, an unfunded plan or program must be "bona fide" and not a mere simulation or sham for avoiding compliance with the act.
>
> In order to insure against the possibility that this provision might be used to avoid compliance with the act, the committee contemplates that the Secretary of Labor in carrying out his responsibilities under Reorganization Plan No. 14 of 1950, as a minimum requirement, would direct an employer to set aside in an account assets which, under sound actuarial principles, will be sufficient to meet the future obligation of the employer under the plan. The preservation of this account for the purpose intended would, of course, also be essential.

*Id.* at 2344.

This history indicates that the principal feature of a funded plan is that an employer must relinquish all control over fringe benefit funds. The Senate Report specifically notes that this most likely will occur in the context of collectively bargained fringe benefit plans. Unfunded plans, on the other hand, contemplate situations where an employer does not relinquish the funds to a third party, but rather retains the funds and provides fringe benefits directly to its employees. Because the employer is maintaining the plan itself, the Report stresses that the plan must be actuarially sound, and may not be a sham designed to avoid compliance with the Act.

Miree argues that although the Report found that the "majority" of funded plans would be collectively bargained, this does not preclude non-union contractors from contributing to funded plans. In this case, it is undisputed that Miree's contributions to the ABC plan were irrevocable. Thus, Miree contends that it has satisfied the requirements of subparagraph (A) and its fringe benefit payments should be evaluated under the "rate of contribution" test. This contention is bolstered by the Committee's recognition of "the various types of arrangements commonly used to provide fringe benefits through employer contributions." *Id.* at 2344.

By contrast, Member Dunn found that the legislative history's reference to the National Labor Relations Act clearly indicated that funded plans were intended to be collectively bargained plans, and unfunded plans were non-union employer-provided plans. He noted that collective bargaining agreements expressly provide for employer contributions to fringe benefit plans. Because these agreements are approved by the Department of Labor, he found that funded plans were therefore subject to less scrutiny for purposes of the Davis–Bacon Act. As long as an employer makes contributions "pursuant to" the requirements of a collectively bargained plan, no further inquiry is necessary. Non-union, unfunded plans, on the other hand, require greater scrutiny, as is evidenced by the Senate Committee's concern that such plans meet a test of "actuarial soundness." Under this heightened standard of scrutiny for unfunded plans, Member Dunn interpreted "rate of costs" to mean Miree's actual costs in providing training to its one carpenter.

We find it unnecessary to resolve this debate because we hold that whether an employee benefit plan is funded or unfunded, an employer may only receive Davis–Bacon credit for contributions that are reasonably related to the cost of the training provided. As for unfunded plans, the statute is clear: credit is only allowable for costs "reasonably anticipated in providing benefits." Furthermore, the legislative history links this language to a test of

"actuarial soundness." As for funded plans, although there is no express statutory requirement of reasonableness, we find such a requirement implied by the purpose of the statute and the legislative history. The Davis–Bacon Act "was not enacted to benefit contractors, but rather to protect their employees from substandard earnings...." *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 177, 74 S.Ct. 438, 441, 98 L.Ed. 594 (1954). The fringe benefits provided for in the Act "constitute an integral part" of an employee's wage. S.Rep. No. 963, 88th Cong., 2d Sess. (1964), *reprinted in* 1964 U.S.Code Cong. & Admin.News 2339, 2340. If an employer could make contributions to a fringe benefit plan that were not reasonably related to the benefits actually received by the employee, the employee would not receive an appropriate "wage" as contemplated by the Act.

■ The issue before us then, is whether Miree's contributions to the ABC plan were reasonably related to the costs of providing apprenticeship training to its employees. The Department of Labor argues that the statute allows credit for contributions "for defraying costs of apprenticeship." The ABC plan is approved by the Department of Labor Bureau of Apprenticeship Training and charges $500.00 for tuition. Therefore, according to the Department of Labor, Miree's only creditable costs of apprenticeship were the $500.00 for its one carpenter enrolled in the ABC plan. The Department states that union employers are treated similarly: union contractors are given credit only for amounts actually required by approved collective bargaining agreements. If a union employer contributed more than the amount required by its plan, the excess contributions would be disallowed. The following stipulation made by the Department explains its position: "The Department of Labor gives full credit for the amounts required to be contributed under a [collectively bargained] plan, based on the assumption that there exists a reasonable relationship between the amount of contributions on the one hand and the cost of providing training and administering the

plan on the other hand." Letter of Administrator of February 20, 1987 (R. 16).

The Department states that the statutory language supports its contention. For funded plans, employers receive credit for their "rate of contribution" made "pursuant to" a plan. According to the Department, amounts in excess of a plan's requirements are not made "pursuant to" the plan. As for unfunded plans, the word "costs" is substituted for the word "contribution." The Department argues that "costs" means *actual* costs. By reading the two provisions in such a way, the Department claims that employers are prevented from contributing more than the amounts approved by the Department. Any contributions above the amount approved by the Department are not reasonable.

Miree complains that the Department's interpretation discriminates against non-union employers. The Department assumes that contributions to union plans bear a reasonable relationship to costs of training, yet the Department makes no such assumption for non-union employers. This is unfair, according to Miree, because unions often make contributions pursuant to plans that exceed the costs for the number of employees actually enrolled in the plans. In fact, the Department concurred in the following stipulation: "The Department of Labor allows credit for apprenticeship fund deductions by employers who are parties to a collective bargaining agreement which were made in accordance with the provisions of that agreement, *regardless of whether those employers currently employ apprentices.*" Stipulation of Facts (R. 128); Letter of Administrator of February 20, 1987 (R. 16) (emphasis added). Chairman Andrews agreed with Miree on this issue, finding that the Administrator's position was inconsistent with the practical realities · of apprenticeship plans:

> The very nature of apprenticeship programs would make it actuarially unsound, fiscally imprudent, and practically inadministrable to require each participating employer to maintain at all times the exact number of apprentices in training that would simultaneously consume

the combined contributions of its own employees. Thus, apprenticeship programs, whether union or nonunion, may receive in a month more contributions than actually expended, just as in other months they may expend more than actually received.

Decision of the Wage Appeals Board at 32–33 (R. 346–47) (Andrews, Chairman, dissenting).

We agree with the Department of Labor that Miree's contributions above the amount actually required by the ABC apprenticeship plan are not reasonable and therefore not creditable for Davis–Bacon Act purposes. While it may be true that many plans receive hourly contributions and often do not have a direct correlation between the contributions received for a given period and the training costs of the apprentices enrolled during that period, this does not appear to be the case with the ABC plan. An examination of the record makes clear that the ABC plan charges tuition of $500.00 per year and receives very few hourly contributions. There is no evidence that the plan relied on hourly contributions from Miree or any other contractor to make up for deficiencies caused by an insufficient tuition rate (R. 292–302). To the contrary, it appears that the $500.00 fee charged by ABC was reasonably related to the cost of training the apprentices enrolled in the program.

Moreover, although Miree's hourly contributions were more than adequate to cover the training costs of its one carpenter, Miree has produced no evidence to show that the ABC plan ever would have allowed Miree to have more apprentices enrolled than its total hourly contributions could pay for. In light of this factor, we fail to see how Miree's employees could ever benefit from Miree's supposedly flexible system of contributions. It appears that Miree's practice simply would amount to a continual process of contributing more to the apprenticeship training plan than would ever be used by Miree employees. While this might achieve Miree's goal of being more competitive with union contractors, it thwarts the purposes of the Davis–Bacon

Act—ensuring that employees receive the entire wage determined to be prevailing in the locality.

Finally, we perceive no unfairness in our interpretation of the statute. So long as Miree enrolls its employees in approved apprenticeship training plans, the Department of Labor must give Miree full credit for the cost of that training. If it is true that on future projects Miree may employ many more apprentices, Miree will receive credit at that time. On projects where Miree is not employing many apprentices, it cannot complain that it must meet its Davis–Bacon wage obligations through payments to its employees rather than payments to an apprenticeship plan—the financial effect on Miree is the same, it must pay a total amount not less than the prevailing wage.

This treatment is consistent with the Department's treatment of union contractors. Although the Department assumes that hourly contributions made pursuant to collective bargaining agreements are reasonably related to the cost of providing training, this assumption is reasonable. In the collective bargaining context, unlike the situation in this case, union employees bargain for the package of cash and fringe benefits that will make up their total wage. No union would bargain away its cash wages for apprenticeship training contributions unless those contributions would actually end up being used for training. In this case, Miree contributed $11,293.52 of money that otherwise could have been paid to employees in cash, yet provided only $500.00 worth of training to its employees. It is unlikely that a union would agree to such a plan. Although it is conceivable that a union employer could overfund a fringe benefit plan to the detriment of its employees, that case is not before us. In this case, Miree's creditable contributions were appropriately limited to $500.00.

## IV. Annualization

Having determined the amount of contributions creditable toward Miree's Davis–Bacon prevailing wage obligations, that amount must be converted into an hourly rate. The Administrator calculated this amount by dividing the total contributions made for a given classification of employee during the year by the total number of hours worked in that classification during the year on both government and nongovernment work. The Administrator reasoned that this method of calculation, the "annualization" principle, prevented employers from receiving Davis–Bacon credit for fringe benefits actually paid to employees during non–Davis–Bacon work. Miree argues that the hourly rate conversion should have been made by dividing its contributions by the number of hours worked on Davis–Bacon projects only.

Miree first contends that its contributions were reasonably related to the cost of apprenticeship training. Thus, according to Miree, the contributions adequately paid for training during the Davis–Bacon work, and there was no "extra" left to fund non–Davis–Bacon training. Whether or not Miree provided training during its non–Davis–Bacon work was of no concern to the government. We find this argument unpersuasive. In the context of a collective bargaining agreement, hourly contributions are made throughout the entire year for training received throughout the entire year. Like union plans, the ABC plan clearly contemplates year-round training. In the case of carpenters, an apprentice must complete three twelve-week quarters of classroom training coupled with 2,000 hours of on-the-job training in each of four years to become a journeyman (R. 305). Thus, if Miree enrolls an employee in the ABC plan, that employee receives a year-long benefit. In order to compute the value of this benefit on a per-hour basis, the cost of the benefit must be divided by the number of hours worked in the year. Here, Miree only contributed to the ABC plan during its Davis–Bacon work. The Administrator was correct in annualizing these contributions for purposes of Davis–Bacon Act compliance.

Miree attempts to refute this reasoning by suggesting that apprenticeship training is "inherently different" from other types of fringe benefits because the employee whose wages are reduced for contributions to an apprenticeship training program re-

ceives no direct pecuniary benefit from the training. For example, if an employer contributes $200.00 of a journeyman carpenter's wages to a health insurance fund, that carpenter receives a benefit, the value of which is $200.00 worth of insurance. If an employer contributes $200.00 of a journeyman carpenter's wages to an apprenticeship training fund, that carpenter receives nothing. Rather, an apprentice carpenter receives training at the expense of the journeyman. Miree contends that it is this difference which explains why the annualization principle is appropriate for other fringe benefits, but not for apprenticeship training. Miree proceeds with the above example to prove its point. According to Miree, if the above employer did 75% of its work in a year on Davis–Bacon projects, and health insurance costs $200.00 per year, the employer could provide health insurance in either of two ways: (1) provide health insurance all year, but receive only the annualized amount of $150.00 as credit toward its Davis–Bacon wage obligations, or (2) provide health insurance only on its Davis–Bacon work and receive Davis–Bacon credit for the full $150.00 cost of the insurance. Either method would be legitimate because the government has no interest in the employer's non–Davis–Bacon work. Miree asserts that apprenticeship training costs must be treated differently: the fact that an apprentice receives training all year is irrelevant when calculating the Davis–Bacon wage of a journeyman because the journeyman never actually received a "benefit" from the training in the first place.

We find that this theory is contrary to the purpose of the statute. Section 276a(b) lists all bona fide fringe benefits, including apprenticeship training costs, in its definition of "wages." In the Senate Report accompanying the bill to include fringe benefits in an employee's "wage" for Davis–Bacon purposes, the Committee on Labor and Public Welfare specifically stated that "[r]egardless of the form they take, the employer's share of the cost of these plans or the benefits the employers provide are a form of compensation." Based on this history, we cannot agree with Miree that Congress considered apprenticeship costs to be

anything other than benefits to the employees from whose cash wages the costs were deducted.

Furthermore, if there is any difference between apprenticeship costs and other fringe benefits such as health insurance, it is that apprenticeship training cannot be provided on a sporadic basis. As discussed above, the ABC plan provides apprenticeship training on a year-round basis. Although Miree may be correct that an employer can tailor its compensation package to provide health insurance only during Davis–Bacon work, such a plan would not work with apprenticeship training. Meaningful apprenticeship training could not occur if an employer terminated the training every time an employee ceased working on a Davis–Bacon project. Thus, if an employer chooses to make contributions to a year-long training program like the ABC plan as part of its Davis–Bacon compensation package, such contributions can only be credited on an annualized basis.

Miree also contends that application of the annualization principle "amounts to a *de facto* requirement that a contractor make such contributions for jobs in which the federal government admittedly has *no* interest whatsoever." Appellant's Brief at 28 (emphasis original). Again, this argument misunderstands the purpose of the annualization principle. The annualization principle is simply a method of computing the appropriate amount of certain contributions to be credited for Davis–Bacon purposes. Under the statute, employers are free to pay their employees in cash, fringe benefits, or "a combination thereof," so long as the total wage is no less than the prevailing wage in the locality. If an employer chooses to provide a year-long fringe benefit, rather than cash or some other fringe benefit, the annualization principle simply ensures that a disproportionate amount of that benefit is not paid for out of wages earned on Davis–Bacon work.

## V. Cross-classification Training Contributions

▮ The final issue to decide is whether Miree's annualized, creditable contributions may be credited toward its Davis–Bacon obligations to its carpenters, bricklayers,

and laborers, or only to its carpenters. The Administrator ruled that training costs incurred on behalf of one classification of employees could not be credited to offset wage obligations to other classifications.

In view of our holding that creditable contributions must bear a reasonable relationship to the cost of the training provided, *see supra* Part III, we hold that Miree's contributions for training its one carpenter may only be credited toward Miree's Davis–Bacon wage obligations to its carpenters. Again, if it is true that Miree may train bricklayers on its next project rather than carpenters, Miree will be able to receive credit toward its wage obligations to bricklayers at that time.

## VI. Conclusion

After a de novo review of the record and the arguments, we AFFIRM the result reached in the district court. Miree properly received Davis–Bacon credit for contributions reasonably related to the cost of the training provided to its employees, in this case $500.00. In calculating Miree's appropriate hourly creditable rate, the $500.00 amount was properly divided by the number of hours worked by Miree carpenters during the entire year.

AFFIRMED.