**UNITED STATES, Appellee,**

v.

**Lieutenant Colonel Dale E. DUNCAN, 262–68–2093, United States Army, Appellant.**

**ACMR 8601129.**

U.S. Army Court of Military Review.

Decided 9 June 1992.

Classification review of this decision was completed on 10 June 1992. It was released and distributed on 23 June 1992.

For Appellant: Michael L. Sandul, Esquire, and Captain Robin N. Swope, JAGC (argued), Colonel Robert B. Kirby, JAGC, Major Kathleen A. Vanderboom, JAGC, Captain Steven W. Bross, JAGC, Captain Gregory B. Upton, JAGC, Captain W. Renn Gade, JAGC (on brief).

For Appellee: Captain Kenneth H. Goetzke, Jr., JAGC (argued), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Kathryn F. Forrester, JAGC, Major Martin D. Carpenter, JAGC, Captain Mark E. Frye, JAGC, Captain Marcus A. Brinks, JAGC (on brief).

Before NAUGHTON, WERNER and GRAVELLE, Appellate Military Judges.

## OPINION OF THE COURT

NAUGHTON, Senior Judge:

Contrary to his pleas, the appellant was convicted by a general court-martial composed of members of conspiracy to obstruct justice, violation of a lawful general regulation, larceny (thirteen specifications), forgery, making a false claim (two specifications), conduct unbecoming an officer, obstruction of justice, and failure under 18 U.S.C. § 643 (1982) to account for public funds, in violation of Articles 81, 92, 121, 123, 132, 133, and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 921, 923, 932, 933, and 934 (1982) [hereinafter UCMJ]. The appellant was sentenced to a dismissal, confinement for ten years,

forfeiture of $3,350.00 pay per month for ten years,[1] and a fine of $50,000.00. The convening authority approved only so much of the sentence as includes a dismissal, confinement for seven years, forfeiture of $3,350.00 pay per month for seven years, and a fine of $50,000.00.

The appellant has raised numerous errors on appeal. Several need not be addressed because of our decision today, and several are without merit.[2] Those with merit are discussed below.

## I. SPEEDY TRIAL

The appellant contends that the military judge erred in failing to dismiss many of the charges and specifications for violation of the 120-day "speedy trial" requirement of Rule for Courts–Martial 707. Manual for Courts–Martial, United States, 1984, Rules for Courts–Martial 707(a) and 707(e) [hereinafter R.C.M.].[3] We agree that dismissal of the original and first set of additional charges is required.

### A. Facts

The appellant was the supervisor of an Army covert intelligence support group[4] operating as a private security company under the cover name Business Security International (BSI) located in Annandale, Virginia. In mid–1983, the Army conduct-

---

1. The forfeitures should have been expressed in terms of months rather than years. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1003(b)(2).

2. On 12 June 1991, this panel (designated Panel 6 for administrative purposes, but which has had many changes in membership over the lengthy appellate history of this case) heard oral argument in a SCIF (sensitive compartmental information facility) in the Washington, D.C., area. The record in the appellant's highly classified case presently contains some fifty-five volumes, and the parties have filed twenty-six assignments of error. The appellant's trial concluded on 10 November 1986 and the convening authority took action on the appellant's case on 1 May 1987. The record of trial was received in the Defense Appellate Division on 14 May 1987 and the original defense pleading was filed on 8 December 1988. The initial government reply was filed on 23 October 1989. On 30 May 1990, the defense filed a supplemental pleading addressing additional issues. The government reply was filed on 7 June 1991.

Subsequent to oral argument the appellant filed a Petition for Extraordinary Relief in the Nature of a Writ of Mandamus and Suggestion for Consideration *En Banc* requesting the charges be dismissed for lack of speedy appellate review by Panel 6 (designated to hear classified cases) and suggesting that this matter be considered by the Court *en banc* (less the participation of Panel 6). An affidavit from the appellant (petitioner) in support of the petition, concerning what he believed to be the prejudice he has suffered during his experience with the military justice system, was considered by the Court in its action upon the appellant's petition.

On 6 April 1992, Panel 6 issued the following order:

The Suggestion of Consideration *En Banc* was not adopted. The "Petition for Extraordinary Relief," which identifies no respondents by name or title, fails to name the writ sought and to identify its jurisdictional basis, is con-

strued as a supplemental assignment of error specifying additional grounds for relief. As such it will be resolved by the assigned panel in due course.

*Duncan v. United States*, ACMR MISC 9200671 (A.C.M.R. 6 Apr. 1992) (order) (unpub.).

Shortly thereafter, a second petition which corrected some of the aforementioned defects was filed. This petition was referred to Panel 2 for action. On 13 April 1992, without the participation of judges assigned to Panel 6, the suggestion for *en banc* consideration was not adopted by the Court and the petition for extraordinary relief was denied. *Duncan v. Naughton*, ACMR MISC 9200715 (A.C.M.R. 13 Apr. 1992) (order) (unpub.). A writ appeal petition was filed by the appellant with the United States Court of Military Appeals on 21 April 1992. This writ appeal petition was denied. *Duncan v. Naughton*, USCMA Misc. 92–95, (C.M.A. 2 Jun. 1992) (order).

In view of the disposition of appellant's case on other grounds, this "supplemental assignment of error," that he was denied speedy appellate review, is moot. We also note that there is serious doubt that this issue is an appropriate subject for the Court to consider *en banc* or that the Court sitting as a whole, with or without the participation of Panel 6, has the power to order itself or a part thereof (*e.g.*, Panel 6) to perform certain actions regarding appellant's case while the case is still pending initial appellate consideration before a panel.

3. Rule for Courts–Martial 707(a) provides that "[t]he accused shall be brought to trial within 120 days after the earlier of" three specified events, including the date of notice to the accused of preferral of charges. The wording of the version of Rule for Courts–Martial 707(e) in effect at the time of trial provided: "Failure to comply with this rule shall result in dismissal of the affected charges upon timely motion by the accused."

4. Code named "YELLOW FRUIT."

ed an audit of the BSI accounts. As a result of this audit, the Army initiated an administrative investigation into allegations of substantial financial irregularities by numerous individuals assigned to this highly classified, covert operation. The investigating officer found that the allegations were substantiated and recommended a criminal investigation by the Federal Bureau of Investigation (FBI).[5] In December 1983, the General Counsel of the Army referred the matter to the Department of Justice (DOJ) for investigation. Mr. F, a trial attorney with the DOJ, was assigned to the investigation.

Following an extensive investigation, there was a meeting at the Office of the General Counsel of the Department of Defense (DOD) on 1 October 1984. Present were a number of civilian and military officials from the DOD and the Department of the Army. Mr. F testified at the court-martial that the DOJ informed DOD officials that it would prosecute the appellant for three specific criminal transactions and declined prosecution of all other suspected crimes "in favor of court-martial."[6] Authorities within the DOD decided to investigate further the remaining suspected acts of criminal misconduct with a view toward prosecution at a court-martial. In November 1984, a special prosecution team was appointed which included at that time Captain (CPT) M and CPT H, trial counsels, and Lieutenant Colonel (LTC) B, Assistant Staff Judge Advocate, Headquarters, Military District of Washington.

As the two independent prosecutions progressed, military prosecutors, confronted with an expiring statute of limitations on some of the suspected offenses, preferred charges.[7] On 13 May 1985, the appellant was first notified of the preferral of charges.[8] Later that summer, again confronted with statute of limitations concerns, the Army preferred additional charges. On 17 September 1985, the appellant was notified of the preferral of these charges.[9] According to CPT M, the mili-

---

5. According to affidavits filed by the Assistant United States Attorney and the Department of Justice trial attorney who were involved in the investigation and prosecution, the Department of the Army referred the matter to their offices because there were numerous suspects involved, many of whom were not subject to the Uniform Code of Military Justice, and "there was no clear indication of the scope of the criminal problem." Their affidavits suggest that the referral was also motivated by a desire "to insure that there was a valid investigation of the issues that touched the Army leadership, both figuratively and literally." According to one affiant, "the Department of Justice accepted the responsibility for the investigation."

6. The DOJ felt that prosecution in federal district court for these transactions was not feasible because:

 [T]he classification problems were just too severe, that there was no way to break the case down and manage it in such a fashion that no classified information would get out....

 . . . . .

 [Second], and ... of paramount import ..., there were some charges that we ... didn't think a civilian jury could really appreciate and understand.

7. We note, however, that the statute of limitations on many of the alleged crimes would not have expired until the following year: Specifications 1, 2, 3, 4, 5, 7, 13 and 14 of Additional Charge III (alleging larcenies committed on 3 February 1983, 1 May 1983, 31 May 1983, 6 June 1983, 20 June 1983, 15 July 1983, 22 August 1983, and 25 November 1983, respectively); Additional Charge IV and its specification (alleging forgery between August 1983 and September 1985); and, Specifications 1 and 2 of Additional Charge V (alleging false claims on 24 September 1983 and 1 September 1983, respectively). The version of Article 43, UCMJ, then in effect, 10 U.S.C. § 843 (1982), provided a three-year statute of limitations for violations of Articles 121, 123, and 132.

8. The appellant's conviction for conduct unbecoming an officer by making false official statements (Charge II and its specification) arises from this set of charges.

9. This first set of additional charges resulted in convictions for conspiracy to obstruct justice (Specification 2 of Additional Charge I); violation of a lawful general regulation (Specification 2 of Additional Charge II); ten of the thirteen specifications of larceny (Specifications 1 through 5, 7, 8 and 12 through 14 of Additional Charge III); forgery (Additional Charge IV and its specification); two specifications of making a false claim (Specifications 1 and 2 of Additional Charge V); obstruction of justice (Specification 1 of Additional Charge VI); and, failure to account for public funds (Specification 2 of Additional Charge VI).

tary prosecutors did not initiate a thorough investigation of the charges against the appellant until *after* the conclusion of the civilian prosecution in 1986.[10] Court-martial proceedings were deferred pending indictment and prosecution in federal district court.

Civilian prosecutors did not obtain an indictment until 19 November 1985. Trial on the merits in the federal district court case commenced on 10 February 1986. On 12 February 1986, the appellant was convicted of three of the counts for which he had been indicted.[11] The appellant was sentenced on 14 March 1986, to imprisonment for a period of one year plus a $50.00 assessment on each count with all sentences to run concurrently. On 7 April 1986, the Army pretrial investigation of the charges preferred against the appellant was convened pursuant to Article 32, UCMJ. On 12 May 1986, the appellant was notified of the preferral of a second set of additional charges.[12] Charges were referred for trial by general court-martial by the Commander, Military District of Washington, on 10 July 1986. The appellant was "brought to trial" within the meaning of R.C.M. 707 on 28 October 1986.[13] Accordingly, the elapsed time from notification of the charges to presentation of evidence was 533 days for the charges originally preferred, 406 days for the first set of additional charges, and 169 days for the second set of additional charges.

■ On 5 September 1986, the appellant litigated the speedy trial issue. The military judge denied the motion to dismiss. The judge specifically excluded the 275–day period from 14 May 1985 (the date government accountability began after the appellant was notified of the original charges) through 12 February 1986 (the date the appellant was convicted in federal district court). For the period 13 February 1986 through 5 September 1986, the military judge found that the government was accountable for 105 days of that 205–day period.[14] We essentially agree with the

10. His testimony stands in stark contrast to an affidavit executed on 29 April 1985 by LTC B and appended to a motion filed in the appellant's civilian prosecution. LTC B's affidavit states:

> The conclusion of the investigation is imminent. Portions of the investigation have been forwarded to an Army officer who is to make an independent determination as to the truth of each allegation of misconduct and a recommendation as to the appropriate disposition of the matter.

11. The appellant was convicted in the United States District Court for the Eastern District of Virginia of making a false statement in violation of 18 U.S.C. § 1001 (1982), submitting a false claim in violation of 18 U.S.C. § 287 (1982), and theft of government property in violation of 18 U.S.C. § 641 (1982). *See United States v. Duncan,* 816 F.2d 153, 154 (4th Cir.1987). The Court of Appeals for the Fourth Circuit later reversed the appellant's convictions for false statement and false claim and, in light of a government concession, vacated his conviction for theft of government property. *United States v. Duncan,* 816 F.2d at 156.

12. These charges were the basis for the appellant's conviction of three of the thirteen larceny charges (Specifications 1, 5, and 6 of Additional Charge VII).

13. Rule for Courts–Martial in effect at the time of trial provided in pertinent part: "An accused is brought to trial within the meaning of this rule when ... [p]resentation to the factfinder of evidence on the merits begins." R.C.M. 707(b)(3) and R.C.M. 707(b)(3)(B).

14. The military judge's findings excluded or attributed the following days to the government or the defense:

> 13 Feb. 1986 through 8 Apr. 1986 (government) (appointing and processing investigating officer's security clearance, Article 32 sessions begin);
> 9 Apr. 1986 through 18 May 1986 (defense) (processing civilian defense counsel's security clearance);
> 19 May 1986 through 21 May 1986 (government) (Article 32 sessions);
> 22 May 1986 (defense) (civilian defense counsel unavailable);
> 23 May 1986 (government) (Article 32 session);
> 24 through 25 May 1986 (government) (weekend) (we also note the findings fail to mention 25 May 1986);
> 26 May 1986 (defense) (civilian defense counsel unavailable);
> 27 May 1986 through 29 May 1986 (government) (Article 32 sessions);
> 30 May 1986 (excluded) (civilian defense counsel unavailable);
> 31 May 1986 through 5 Jun. 1986 (government) (weekend, Article 32 session, and recess);
> 6 Jun. 1986 (excluded) (civilian defense counsel unavailable);

military judge's findings for this time period with the exception of 14 March 1986 (the appellant was unavailable due to sentencing in federal district court) and 5 September 1986 (the date the speedy trial motion was litigated). We exclude those dates from the government's accountability. We also attribute 19 June 1986 (Article 32 session), 25 June 1986 (a Sunday), and the period 27 August 1986 through 2 September 1986 (lack of diligence to obtain government witness) to the government to bring their total accountability for the period 13 February 1986 through 5 September 1986 to 114 days. Thus, it remains for us to decide whether any or all of the period from 14 May 1985 (the date on which government accountability began) through 12 February 1986 (the date on which the appellant was convicted in federal district court) should be added to the 114 days.

The basis for the military judge's ruling regarding the critical period 14 May 1985 through 12 February 1986 was: "This delay was at the request of the Department of Justice because of the federal criminal trial involving [the appellant] and the Department of Justice caused these [court-martial] proceedings to be delayed." The military judge explained his ruling:

I find that the case was delayed by the Army after the 13th of May until this year because the Department of Justice essentially told them to do so.

. . . . .

7 Jun. 1986 through 18 Jun. 1986 (government) (weekends, travel days, Article 32 sessions, and recesses);
19 Jun. 1986 through 20 Jun. 1986 (excluded) (we note an Article 32 session was held on 19 Jun. and the civilian defense counsel was unavailable on 20 Jun.);
21 Jun. 1986 through 25 Jun. 1986 (government time except for two days of defense delay) (weekend, Article 32 sessions, and recess);
26 Jun. 1986 through 16 Jul. 1986 (government) (preparing Article 32 report, case processing, referral, service of charges, and five-day waiting period);
17 Jul. 1986 (excluded) (Article 39(a) session);
18 Jul. 1986 through 24 Aug. 1986 (defense) (defense requested delay);

I also find that, under our system, the Department of Justice must have primacy in—in the prosecution of criminal cases. Their action to establish their primacy in the investigation and the prosecution were, I believe, a proper exercise of their authority. And this is especially so when the Attorney General is the primary law enforcement authority in the United States.

. . . . .

I find that in this period the government has established good cause for the delay and all that time is excludable.

■ The appellant did not renew his speedy trial motion before the time evidence was presented to the members. The government was never called to account for the period 6 September 1986 through 27 October 1986 and the military judge had no cause to rule on this period of delay. Although the government has not affirmatively established its entitlement, if any, to an exclusion under R.C.M. 707, *see United States v. Facey*, 26 M.J. 421 (C.M.A.1988), we hold that the appellant waived government accountability for this period of delay by failing to reassert the issue. R.C.M. 907(b)(2)(A); *see United States v. Britton*, 26 M.J. 24, 27 (C.M.A.1988). Thus, the total elapsed time for speedy trial accountability for pretrial delay includes 481 days for the original charges (14 May 1985 through 5 September 1986, plus 28 October 1986, the date the appellant was brought to trial),[15] 354 days for the first set of addi-

25 Aug. 1986 through 26 Aug. 1986 (excluded) (Article 39a session);
27 Aug. 1986 through 2 Sep. 1986 (excluded) (DOJ attorney unavailable to testify on motion);
3 Sep. 1986 through 4 Sep. 1986 (defense) (defense counsel unavailable); and
5 Sep. 1986 (excluded) (Article 39a session).

15. The case at bar was tried prior to the date the Court of Military Appeals adopted as a rule of law the *caveat* set forth in *United States v. Burris*, 21 M.J. 140 (C.M.A.1985), and *United States v. Schilf*, 1 M.J. 251 (C.M.A.1976):

[E]ach day that an accused is available for trial is chargeable to the Government, unless a delay has been approved by either the convening authority or the military judge, in writing or on the record.

tional charges (18 September 1985 through 5 September 1986, plus 28 October 1986), but only 117 days for the second set of additional charges (13 May 1986 through 5 September 1986, plus 28 October 1986). Consequently, Specifications 1, 5, and 6 of Additional Charge VII (the second and last additional charges) are not affected by our disposition of this speedy trial issue (see Parts II and III, *infra*).

### B. Government Delay

The appellant's principal challenge to the military judge's ruling concerns the exclusion of the period of time from 14 May 1985 through 12 February 1986.

#### 1. *Stay of Court–Martial Proceedings*

During the hearing on the speedy trial motion, it became apparent that the decision to prosecute the appellant in multiple forums had created a conflict as to which would be first in time. The prosecutors, both military and civilian, were apparently in agreement that the prosecution in federal district court would take priority. When asked whether "[t]he United States Army ... was aware of speedy trial problems but elected to take the chance that those problems might arise later, ..." CPT M responded, "Absolutely true." However, the identity of the person who made the decision and the basis for this decision are obscured by inconsistent and contradictory evidence which suggest alternative bases. Our opinion addresses the apparent basis for the decisions made by the government as well as the military judge's rationale for his denial of the speedy trial motion.

The government's decision to delay prosecution was predicated upon an assertion that the convening authority granted a request by civilian prosecutors to stay court-martial proceedings. The military judge ruled that the DOJ had implicit power to order a stay of court-martial proceedings. CPT M and Mr. F first discussed a request for stay of court-martial proceedings in

early 1985 when they met to coordinate their independent prosecutions.

According to Mr. F, the civilian prosecution team knew "very little" about courts-martial procedure and really weren't concerned about the court-martial proceedings: "The [military] prosecutors advised me there was no [speedy trial] problem. That's all I needed." Mr. F testified that military prosecutors "indicated that [speedy trial requirements] would not be a problem *if we asked them to stay all proceedings against* [the appellant] *until a judgment had been entered in our case.*" [Emphasis added]. He testified further, that he and Mr. G, an Assistant United States Attorney also assigned to the investigation, were not aware that there was a speedy trial issue in the court-martial proceeding until *after* the conclusion of the appellant's prosecution in federal district court.

In accordance with the understanding between CPT M and Mr. F, and despite LTC B's apparent legal conclusion that military authorities lacked authority to proceed, LTC B nevertheless solicited a written request for a stay of court-martial proceedings from the civilian prosecutors. LTC B specifically requested that the written request reference the pretrial investigation required by Article 32 of the Uniform Code of Military Justice. In a letter to LTC B dated 10 September 1985, Mr. F wrote, "I would request that you stay the Article 32 proceedings against" the appellant "until a judgemnet [sic] is entered in our criminal case." In a subsequent letter dated 26 September 1985, Mr. F stated:

> This is to confirm and reiterate that the United States Department of Justice is requesting the Military District of Washington not to provide any discovery [to the appellant or his counsel] ... until a judgment has been issued in the federal criminal prosecution....

According to CPT M, "the court-martial convening authority acted on the request for staying our proceeding."

---

*United States v. Carlisle,* 25 M.J. 426, 428 (C.M.A.1988); *accord United States v. Cook,* 27 M.J. 212, 214 (C.M.A.1988). Upon consideration of the standards for retroactive application of

new rules of criminal procedure, *see generally Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 2879, 92 L.Ed.2d 199 (1986), we will not apply the *Carlisle* rule retroactively to this case.

In theory, we agree that "the conduct of litigation in which the United States ... is a party ... is reserved to officers of the Department of Justice...." 28 U.S.C. § 516 (1982). However, the statutory authority of the DOJ—and the Attorney General and each United States Attorney—is subject to the proviso "[e]xcept as otherwise authorized [provided] by law." 28 U.S.C. §§ 516, 519, 547 (1982).

One such "law" is the Uniform Code of Military Justice. Congress has the power to grant executive agencies other than the DOD authority over military prosecutions, U.S. Const. art. I, § 8, cl. 18, but it has not done so. Rather, Congress has reserved to the discretion of military authorities the power to prefer charges, Article 30, UCMJ, to select the charges to be tried, Article 34, UCMJ, to convene courts-martial, Articles 22, 23, and 24, UCMJ, and to detail counsel to represent the government, Articles 6, 27, and 38(a), UCMJ. The Attorney General and his staffs of prosecutors have no authority to represent the United States in court-martial proceedings. *See* Articles 27(a)(1) & (b) and 38(a), UCMJ.

 An agency may not "bootstrap itself into an area in which it has no jurisdiction." *FMC v. Seatrain Lines, Inc.,* 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620 (1973). The Attorney General's implicit authority under 28 U.S.C. § 519 (1982) cannot supersede the specific provisions of the Uniform Code of Military Justice. *See S & E Contractors, Inc. v. United States,* 406 U.S. 1, 13, 92 S.Ct. 1411, 1418, 31 L.Ed.2d 658 (1972) ("[W]here the responsibility for rendering a decision is vested in a coordinate branch of Government, the duty of the Department of Justice is to implement that decision and not to repudiate it"). We hold that the Attorney General and his staffs of civilian prosecutors have no legal authority to order a stay of court-martial proceedings or to control the prosecutorial function of military authorities.

### 2. *Lack of Authority to Proceed with a Court–Martial*

The second basis for the government's delay is predicated on an apparent belief that military authorities either lacked jurisdiction to proceed or were prevented from proceeding by the DOJ. In an affidavit submitted to the military judge on the speedy trial motion, Mr. F further states that, at the October 1984 meeting:

> [W]e reiterated our prior discussions with [the Department of Defense] and Army military and civilian leaders that *we were still investigating* [the appellant] *and that the Army was not free to proceed with courts-martial proceedings against* [the appellant], *until and unless the Department of Justice concurred in such proceedings, for the Army proceeding could adversely affect our continuing investigation.* [Emphasis in original].

None of the other individuals who attended the meeting were called to verify or to refute his account.[16]

The team of military prosecutors apparently acceded to this demand to defer to the civilian prosecution. A letter dated 3 December 1984 from LTC B to the civilian prosecutors states:

> While I realize that you have retained jurisdiction over certain individuals and issues, with your concurrence, I intend to prepare recommendations concerning appropriate action(s) for all individuals under the jurisdiction of Commander, [Military District of Washington]. *Prior to disclosing my recommendations* concerning those individuals or issues over whom [sic] you have retained jurisdiction, *I intend to fully coordinate the matter with you.* This approach will best serve the interests of the Department of Justice and the Army and will facilitate the expeditious disposition of

---

16. A brief filed before the military judge on behalf of "The United States as Amicus Curiae in Support of the Army" inconsistently characterizes the civilian prosecutors' role in the delay as "a good faith, reasonable request by one prosecuting authority to another to delay further proceedings until the requesting authority complete[d] a pending criminal investigation expected to result in an indictment." Mr. F's name appears on the brief.

all matters under investigation. [Emphasis added].

In another letter dated 11 June 1985, from LTC B to Mr. G, LTC B states:

As you have retained jurisdiction over [the appellant] who is also under courts-martial charges, no pretrial investigation will be conducted pending the grand jury investigation and your subsequent action.

During the hearing, CPT M testified that the DOJ had "assumed" and "retained" jurisdiction over the appellant's "case" and had thereby foreclosed court-martial proceedings against the appellant. As CPT M characterized the situation: "Gee, even if the Army wanted to conduct an administrative investigation it would require the concurrence of the Justice Department." He was of the opinion that a Memorandum of Understanding between the DOD and the DOJ precluded military authorities from proceeding against the appellant in a court-martial until the DOJ granted permission to do so.[17]

### C. Jurisdiction

The premise for the government's assertion of lack of jurisdiction lies in the following observation:

Military jurisdiction is concurrent with civilian federal jurisdiction whenever a person subject to the UCMJ commits an offense that violates both the UCMJ and Title 18 of the U.S. Code. This fact creates an issue as to which authority, military or civilian, will have the right to exercise primary jurisdiction.

Answer to Assignment of Errors at 12–13. The government argues that the Memorandum of Understanding between the DOJ and DOD authorizes federal civilian prosecutors "to assert primary jurisdiction, and prohibit [military authorities] from investigating appellant's case until the conclusion of appellant's civilian trial." We disagree.

### 1. *Jurisdiction and the Military and Federal Criminal Justice Systems*

Congress has created two separate criminal justice systems, one civilian and one military. Federal district courts have original jurisdiction over "offenses against the laws of the United States," *see* 18 U.S.C. § 3231 (1982), but have no jurisdiction over offenses prescribed by the Uniform Code of Military Justice. *See* 10 U.S.C. §§ 878, 881–934 (1982) (violations of the Uniform Code of Military Justice are "punished as a court-martial may direct"). Court-martial jurisdiction is limited to those offenses prescribed by the Uniform Code of Military Justice. Articles 18, 19, and 20, UCMJ. These courts operate independently of one another. As stated above, the prosecution function of the military system is independent from that of the civilian system.

While the subject-matter jurisdiction of federal district courts and courts-martial is not "concurrent" in the technical sense, crimes committed by servicemembers are often susceptible to prosecution "either" in federal district courts and at courts-martial because the substantive provisions of the Uniform Code of Military Justice closely parallel the codified "offenses against the laws of the United States." Moreover, courts-martial jurisdiction extends to every criminal act by servicemembers otherwise susceptible of prosecution in federal district court by virtue of the "crimes not capital" clause of Article 134, UCMJ. Consequently, a conflict of priority may arise between these criminal justice systems.

■ Congress has declined to adopt proposals that it enact legislation giving civilian courts priority of jurisdiction over courts-martial. *See generally* Constitutional Rights of Military Personnel: Summary—Report of Hearings by the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate, 88th Cong., 1st Sess. 22–26 (1963)

---

**17.** This Memorandum of Understanding had been published as a Department of Defense Directive. *See* Dep't of Defense Directive 1355.1, Relationships with the Department of Justice on Grants of Immunity and the Investigation and Prosecution of Certain Crimes (21 July 1981). It is currently published as Department of Defense Directive 5525.7, Implementation of the Memorandum of Understanding Between the Department of Justice and the Department of Defense Relating to the Investigation and Prosecution of Certain Crimes (22 January 1985) and is included in the Manual for Courts–Martial, United States, 1984, at appendix 3.

[hereinafter Constitutional Rights of Military Personnel].[18] Instead, the question of priority is resolved by case law. "Just as the Supreme Court urged Federal civilian courts to 'give careful consideration to the appropriate demands of comity' when related proceedings are pending before courts-martial, the military justice system should consider the 'demands of comity' in connection with related proceedings in a Federal District Court." *Woodrick v. Divich*, 24 M.J. 147, 153 (C.M.A.1987) (citations omitted). Thus, the analysis of *Ponzi v. Fessenden*, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922), controls:

> One accused of crime, of course, can not be in two places at the same time. He is entitled to be present at every stage of the trial of himself in each jurisdiction with full opportunity for defense.

> . . . . .

> [T]he court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take for its purpose.

*Ponzi v. Fessenden*, 258 U.S. at 260, 42 S.Ct. at 310 (citations omitted). Although the jurisdictional conflict between a court-martial and a federal district court is not one of dual sovereigns, the rule of judicial comity dictates the same result. *See, e.g., United States v. Cart*, 36 C.M.R. 858, 865–866 (A.F.B.R.1966), *pet. denied*, 36 C.M.R. 541 (C.M.A.1966). As a consequence of this "first-in-time" rule of comity, military and civilian prosecutors therefore compete for prosecutorial priority because "[t]he

Government, and not the courts, is responsible for initiating a criminal prosecution." *Garrett v. United States*, 471 U.S. 773, 790 n. 2, 105 S.Ct. 2407, 2417 n. 2, 85 L.Ed.2d 764 (1985). *Cf. United States v. Fernandez*, 24 M.J. 77, 78 (C.M.A.1987) (In referring a case to trial, a convening authority is functioning in a prosecutorial role). *See also Ball v. United States*, 470 U.S. 856, 859, 105 S.Ct. 1668, 1670, 84 L.Ed.2d 740 (1985). Legislators recognized this fact when they declined to enact legislation assigning priority of jurisdiction:

> Whether a serviceman should be tried by court-martial or by civil court for alleged misconduct over which both have jurisdiction, the subcommittee considers can best be left to informal arrangements between appropriate commanding officers and civil authorities.

Constitutional Rights of Military Personnel, *supra* p. 15, at 26. However, the fact that "informal arrangements" may informally determine whether a soldier is prosecuted in federal court or at a courts-martial does not mean that one agency may divest itself of or deprive another of "jurisdiction."

### 2. *The Memorandum of Understanding*

In our federal system of government, it is not uncommon for Congress to charge executive agencies[19] with overlapping duties and coterminous responsibilities. In order to avoid unnecessary expense and confusion, agencies frequently enter into memoranda of understanding by which they agree to share information,[20] coordinate the discharge of their duties,[21] and

---

**18.** The subcommittee stated that such a statutory limitation of courts-martial jurisdiction "would be difficult to administer, might in some instances act to the detriment of the serviceman, and would place an undue burden on military authorities in the performance of their duty to maintain discipline ... [and] might be troublesome to work out the detailed procedures under which the civil courts could assert their priority of jurisdiction." *Id.* at 26.

**19.** We use this term as it is defined at 5 U.S.C. § 105 (1982) ("'Executive agency' means an Executive department, a government corporation, and an independent establishment").

**20.** *See, e.g., Emerson Elec. Co. v. Schlesinger*, 609 F.2d 898 (8th Cir.1979) (Department of Labor's Office of Federal Contract Compliance Programs and the Equal Employment Opportunity Commission, both charged with eradicating employment discrimination, agreed to share information and reports by employers).

**21.** *See, e.g., Duke City Lumber Co. v. Butz*, 382 F.Supp. 362 (D.D.C.1974), *opinion adopted in part by* 539 F.2d 220 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977) (Department of Agriculture and Chief of the U.S. Forest Service, charged with sales of government owned timber, and the Small Busi-

assign primary responsibility for coterminous functions.[22]

▮ The DOD and the DOJ have entered into a Memorandum of Understanding that assigns *prosecutorial* priority between their *prosecutorial* staffs and provides for coordination of the government's *prosecutorial* efforts. The government interprets the terms of this agreement as either divesting the DOD of courts-martial jurisdiction or giving the DOJ the power to stay courts-martial proceedings.[23] We hold that the agreement cannot extinguish court-martial jurisdiction or grant the DOJ the power to intervene in or order a stay of court-martial proceedings.

▮ An agency's power to promulgate regulations is limited to the authority delegated to it by Congress. *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In this case, the government points to the Memorandum of Understanding and asserts that the Army lacked the power or authority to bring the appellant to trial by court-martial. An interdepartmental agreement can neither modify the statutory contours of a court's jurisdiction nor divest an agency of its statutory powers. *See Earth Island Institute v. Mosbacher,* 929 F.2d 1449 (9th Cir.1991) (agencies do not have the discretion to issue regulations which conflict with statutory language);

*Cooke v. Orser,* 12 M.J. 335, 345 (C.M.A. 1982) (commanders may not functionally relieve themselves of their prosecutorial responsibilities). An interdepartmental agreement cannot confer upon the DOJ a power or authority expressly reserved to the DOD. *See FMC v. Seatrain Lines, Inc.,* 411 U.S. at 745, 93 S.Ct. at 1784. Under the Uniform Code of Military Justice, the authority of the DOJ does not extend beyond the right to request that military authorities surrender a soldier for trial in a civilian court. Article 14, UCMJ.

To the extent that the provisions of the Memorandum of Understanding are interpreted to attempt to accomplish either of these acts (extinguish court-martial jurisdiction or grant the DOJ the power to intervene in or order a stay of court-martial proceedings), they conflict with the Uniform Code of Military Justice. We cannot permit the DOD and the DOJ to accomplish an act that is expressly forbidden by statute. Article 36(a), UCMJ; *see Marks v. Central Intelligence Agency,* 590 F.2d 997, 1003 (D.C.Cir.1978) (a President's executive orders may not supersede or contravene a statute).

### D. "Good Cause"

The government claims the facts of this case constitute good cause for delay as outlined in R.C.M. 707(c)(9).[24] We now examine the underlying circumstances assert-

---

ness Administration, charged with assisting and protecting small businesses, agreed on a set aside program to protect small lumber companies).

22. *See, e.g., County of Rockland v. U.S. Nuclear Regulatory Comm'n,* 709 F.2d 766 (2d Cir.1983) (Nuclear Regulatory Commission and Federal Emergency Management Agency agreed on primary responsibilities with respect to emergency planning).

23. The provisions of the Memorandum of Understanding do not support this interpretation. The Memorandum provides that the DOD has investigative responsibility over frauds against the DOD and theft of government property, the crimes for which the appellant was prosecuted by the DOJ. The Memorandum also provides that crimes committed outside a military installation by persons subject to the Code which are normally tried by courts-martial "will be investigated and prosecuted by the Department of Defense."

Further, the government introduced no evidence either at trial or on appeal that any government official involved in the case shared CPT M's interpretation. The brief submitted to the trial court by the DOJ and the United States Attorney's Office "For the United States as Amicus Curiae in Support of the Army," states:

We submit that the May 6, 1985, request by the Department of Justice (DOJ), that the Army prosecutors defer further action in their case until the conclusion of the federal civilian prosecution, provided 'good cause' for the delay in bringing [the appellant] to trial in the court-martial.

24. At the time of appellant's trial (Fall 1986), this provision was designated as (c)(8). On 27 March 1987, the President redesignated (c)(8) as (c)(9) without any change in text. Exec. Order No. 12,586, 50 Fed.Reg. 7103, 7105, 7112 (1987). We will refer to the "good cause" provision by its present designation (c)(9).

ed by the government to determine *de novo* whether there was "good cause" for the convening authority's decision to delay.

■ We reject out of hand several bases for exclusion asserted pursuant to the "good cause" exception at trial. These include arguments premised upon (1) the complex nature of the case, (2) the fact that the case was highly classified, and (3) the fact that the appellant initiated a collateral civil suit in federal district court.[25] While any one or a combination of these factors might have warranted the exclusion of a *reasonable* period of delay for good cause, a causal connection or nexus between the delay and the event offered in justification for exclusion must be established before the government is entitled to an exclusion for good cause. *See United States v. Longhofer*, 29 M.J. 22, 27 (C.M.A.1989) ("good cause" implies a causal connection or "nexus" between an unusual event and government delay). The record clearly establishes that the 275–day period of delay in issue did not result from any of these circumstances.

■ Additional factors cited as reasons establishing good cause delay are as discussed below. First, the DOJ feared disclosure, both authorized and unauthorized, of classified information. Second, the DOJ wanted to maintain "full control" over discovery procedures and thereby limit the scope of discovery available to the appellant to that provided by federal rules. Third, the DOJ was concerned that the appellant might somehow exploit court-martial proceedings to chill the cooperation of government witnesses. We find scant merit—much less good cause—in any of these circumstances when we weigh the interests of the accused in a speedy trial "against the ends of justice that may be served by a delay in trial." *United States v. Durr*, 21 M.J. 576, 578 (A.C.M.R.1985); *accord United States v. Lilly*, 22 M.J. 620, 625 (N.M.C.M.R.1986); *see also United States v. Givens*, 28 M.J. 888, 891

(A.F.C.M.R.1989), *set aside by* 30 M.J. 294 (C.M.A.1990).

■ In order to establish good cause, the event or circumstance offered must justify the delay. We immediately reject the second and third factors. These factors are tactical concerns amounting to no more than a desire to forestall the appellant's right of discovery and his right of cross-examination at the pretrial investigation and at his court-martial. In effect, the justification for noncompliance with the speedy trial mandate is founded on the civilian prosecutors' perceptions that the appellant might have derived some tactical advantage in federal court if afforded discovery pursuant to R.C.M. 701 and R.C.M. 702, and the right of cross-examination pursuant to the sixth amendment and R.C.M. 405(f). We hold that a tactical desire to deny an accused the rights appurtenant to court-martial does not suffice to establish good cause for denial of the right to speedy trial.

With respect to the first factor, the DOJ refers both to a generalized fear that the appellant might make unauthorized disclosures of classified information and to a specific fear that the appellant might utilize classified information obtained during court-martial proceedings to *"greymail"* federal prosecutors. " 'Greymail' occurs when a defendant seeks to disclose classified information as part of his or her defense, requiring the government either to permit disclosure or to dismiss the prosecution." *United States v. Smith*, 899 F.2d 564, 565 n. 1 (6th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 135, 112 L.Ed.2d 103 (1990). There is also a potential for "greymail" when a defendant seeks discovery of classified information, thus compelling the government to produce or to drop the prosecution. *See United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir.1988).

25. On 12 April 1985, the appellant filed a civil suit in federal court based in part upon an alleged violation of the Right to Financial Privacy Act of 1978. *See* 12 U.S.C. § 3417 (1982); *see generally* 12 U.S.C. §§ 3401 to 3422. This suit named as defendants the American Express Company and three named individuals. The individuals had participated in the investigation of the appellant's activities and were potential witnesses against the appellant.

Mr. F testified, "We could control the distribution of classified information in federal court because we invoked CIPA [the Classified Information Procedures Act] and anything done in violation of CIPA would have resulted in issuance of contempt action." This protection would not have been lost had the appellant been first tried at court-martial.

Well aware that potential disclosure of such matters in an open forum might frustrate the ends of criminal justice by deterring prosecution, Congress passed the Classified Information Procedures Act, 18 U.S.C.App. §§ 1–16 (1982). *See United States v. Sarkissian,* 841 F.2d at 965 (citing S.Rep. No. 823, 96th Cong., 2d Sess. 4 (1980), *reprinted in* U.S.C.C.N.A. 4294, 4297). *Accord United States v. Smith,* 899 F.2d at 565 n. 1; *United States v. Anderson,* 872 F.2d 1508, 1514 (11th Cir. 1989), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); *United States v. Rewald,* 889 F.2d 836 (9th Cir.1989) *opinion amended by* 902 F.2d 18 (9th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990); *United States v. Smith,* 780 F.2d 1102, 1105 (4th Cir.1985). CIPA permits the government "to have the trial court examine classified information in camera and ex parte" prior to disclosure to the defendant and prior to admission into evidence for a determination "whether it is necessary for the defense, or if a proffered substitution would suffice to protect the defendant's constitutional rights and the secrecy of the information." *United States v. Smith,* 899 F.2d at 565 n. 1. CIPA also requires the defendant to disclose all classified information in his possession which he intends to offer at trial; the government may also obtain a preliminary ruling as to the admissibility of these matters as well. *See generally United States v. Collins,* 720 F.2d 1195 (11th Cir. 1983). Thus, CIPA protections would have still been available in the federal prosecution had the court-martial been tried first.

Military Rule of Evidence 505 mirrors CIPA. While Mr. F's ignorance of military proceedings is excusable, his ignorance cannot be imputed to the convening authority who ordered the delay in trial. The convening authority knew, should have known, or should have been advised by his staff judge advocate, that the military did in fact have a counterpart to CIPA. This aspect of Mr. F's fears does not afford a basis for finding good cause for delay. Further, both the military prosecutors and Mr. F should have known that any unauthorized disclosure of classified information is a substantive offense under the federal code. *See* 18 U.S.C. § 793(d) (1982).[26] This offense applies equally to unauthorized disclosures made to the press. *United States v. Morison,* 604 F.Supp. 655 (D.Md.1985), *appeal dismissed,* 774 F.2d 1156 (4th Cir. 1985). Thus, the available sanctions were irrelevant to the sequence of the appellant's prosecutions.

Moreover, the record establishes that the appellant was privy to an extensive amount of classified information before both his indictment and the preferral of charges. Delaying court-martial proceedings could neither obviate nor alleviate the potential for unauthorized disclosure even if the appellant was so inclined. With respect to any additional classified information which may have been produced through discovery, the potential for unauthorized disclosure would have persisted regardless which proceeding was tried first. The sequence of the prosecutions could not obviate the danger that the appellant might disclose information discovered during court-martial proceedings.

### E. "Other Proceedings"

We agree with the military judge that a federal prosecution does not constitute "other proceedings in the case" for purposes of R.C.M. 707(c)(1). The language of

---

**26.** This statute provides in pertinent part:
Whoever, lawfully having possession of … any … information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States … willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted … to any person not entitled to receive it …
Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

R.C.M. 707(c)(1) is quite distinct from that of the Speedy Trial Act of 1974, 18 U.S.C. § 3161(h)(1)(D) (1982),[27] and must be interpreted accordingly.

However, we do find that the government is entitled to an exclusion of the period during which the appellant was being prosecuted in federal district court. As indicated previously, the judicial doctrine of comity requires that federal district courts and courts-martial stay their proceedings when the jurisdiction of the other has attached first in time. In this case, jurisdiction over the appellant attached at the time the indictment was filed in federal district court and continued until the time a jury returned a verdict. *Compare* Fed.R.Crim.P. 9 *with* Fed.R.Crim.P. 4. Accordingly, we hold that the appellant was unavailable for court-martial within the meaning of R.C.M. 707(c)(6) from 19 November 1985, the date the indictment was filed with the district court, through 12 February 1986, the date on which the appellant was convicted. Although military authorities could have secured priority of court-martial jurisdiction by sooner referring the charges, this 86-day period of delay is reasonable and will be excluded. *Cf. United States v. Longhofer*, 29 M.J. at 27 (reasonable delay is excludable without regard to causation). We also deduct one day of accountability, 14 March 1986, the date the appellant's presence for sentencing was required in federal district court.

### F. Conclusion

Deducting 87 days from the government's accountability for the appellant's unavailability and the 91 days excluded or attributed to the defense, and finding no facts or circumstances which would otherwise warrant exclusion, the government is accountable for 303 days of pretrial delay for the originally preferred charges and 176 days of pretrial delay for the first additional set of charges. The appellant's right to speedy trial was violated and he is therefore entitled to the remedy provided by R.C.M. 707(e): that is, dismissal of the original charges and the first set of additional charges.

We agree with Mr. F's evaluation that the federal prosecution and the court-martial had to be tried serially. However, Article 30(b), UCMJ, R.C.M. 401(b), R.C.M. 707, and the statute of limitations then in effect, Article 46, UCMJ, mandated that the court-martial charges be given tactical precedence over those considerations underlying the decision to first prosecute the appellant in federal district court. We find no small irony in Mr. F's observation that "[t]he case at bar itself demonstrates the need for a coordinated prosecution effort in the interest of fairness and efficiency." Appellate Exhibit XII at 4. Our dismissal of the original and first set of additional charges leaves for resolution the disposition of several specifications under Additional Charge VII.

## II. SUFFICIENCY OF EVIDENCE: SPECIFICATIONS 5 AND 6 OF ADDITIONAL CHARGE VII

Although the issue was not clearly raised by the appellant, we find that the evidence of record is factually insufficient to support the appellant's convictions of Specifications 5 and 6 of Additional Charge VII. These specifications charged:

Specification 5: (U) In that [the appellant] ... did ... on or about 29 September 1983, steal $1,151.06, the property of the United States, by including that amount on a voucher and receiving credit against his accountability for government funds for that official expense when said expense was paid by and properly previously credited to the account of [another servicemember], at that time a member of [the appellant's] unit.

Specification 6: (U) In that [the appellant] ... did ... on or about 29 September 1983, steal an unused airplane ticket of a value of $241.00, the property of the United States, by including $265.00 on a voucher and receiving credit against his

---

27. This section excludes from accountability "Any period of delay resulting from other proceedings concerning the defendant, including ... delay resulting from trials with respect to other charges against the defendant."

accountability for government funds for the official expense when $241.00 of that expense was also included earlier in the figure $482.00 reflected on the same voucher, and not returning the unused portion of the $482.00 round trip ticket during the audit of his voucher.

 The standard for this court's review for factual sufficiency of the evidence is well settled:

> [T]he test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987); Article 66, UCMJ. Additionally, we have "awesome, plenary, de novo power of review" that allows us to substitute our judgment for that of the court members. *See United States v. Cole*, 31 M.J. 270, 272 (C.M.A.1990).

In order to convict a person of the offense of larceny under Article 121 of the code, there must be proof that a wrongful taking, obtaining, or withholding of property with the intent to permanently deprive or defraud the owner of such property has occurred. M.C.M., 1984, Part IV, para. 46b(1). While there may be a dispute as to whether the appellant took, obtained, or withheld government funds, we find that our resolution of the sufficiency issue focuses on whether the evidence showed that the appellant possessed the requisite criminal intent or *mens rea*.

According to the evidence of record, much of it presented by the government's own witnesses, the appellant's duties and his financial activities associated with the operations of BSI were not regulated by the usual bureaucratic administrative procedures and policies governing the spending of government funds. For example, there was testimony that Army finance regulations and the Joint–Travel Regulations published by DOD did not apply to the appellant's highly sensitive covert intelligence activities. When payments or advances of government funds were made to the appellant for travel, lodging, meals, equipment, and for other expenses related to his intelligence activities, there was virtually no accountability but the implied caveat that the money was to be spent in the best interests of the government and that the covert intelligence system relied on the integrity of its agents. As a practical matter, in funding such intelligence operations, expenditures for the most part were approved after the fact.

There appears to have been little guidance from higher echelons concerning the handling of funds within the covert intelligence community other than the concern of "live your cover" and "accomplish your mission." Commingling of personal and government monies was frowned upon by some, but apparently not because it may have abrogated a "fiduciary" relationship, assuming one existed, between the appellant and the government, but because it would be very difficult to keep track of the monies. Although it would appear that the appellant may have misused his position and violated his obligation to render loyal service to the government, under the unique circumstances presented here, the "normal" rules involving accountability and fiduciary duties did not seem to apply and the appellant's conduct did not evidence the necessary *mens rea*. In short, the conduct was not criminal.

### III. SUFFICIENCY OF EVIDENCE: SPECIFICATION 1 OF ADDITIONAL CHARGE VII

 The appellant contends that the evidence alleging larceny through the purchase of airline tickets for personal use is insufficient to support his conviction of larceny under any theory thereof. The appellant was arraigned and convicted on the following specification:

> Specification 1: (U) In that [the appellant] ... did ... on or about 22 August 1983, steal $3,934.00, the property of the United States, by purchasing two airline tickets costing $1,967.00 each, for his wife and the wife of an associate, neither of whom were performing US govern-

ment business and paying for said tickets with US Government funds.

The evidence established that a "corporate" American Express credit card had been issued in the appellant's name for operational use.[28] The use of this card would decrease the appellant's demand for advanced funds. Charges on this card were paid with government funds. Using this card, the appellant purchased the tickets on 28 July 1983. When Mr. X, the individual responsible for disbursing funds to pay the account, received the account statement, no supporting documents were attached. However, the "corporation" (BSI) routinely disbursed government funds without supporting documentation and Mr. X paid this bill as well.

Although charges on this card were paid with government funds, evidence indicates that charging personal expenditures to the "corporate" account was authorized so long as the government was reimbursed.[29] At the close of the government case on the merits, the appellant moved for a finding of not guilty:

> [T]he evidence shows that [the appellant] wrote a note on the bill stating ...

> . . . . .

> that they would resolve it later. He sent it to the proper people. The bill was later paid with a personal check.

The government responded by informing the military judge that it was proceeding on the theory that:

> [A]t the time [the appellant] directed or authorized or allowed by stripping the backup documentations and writing a note on that check saying that it will be settled or something to that effect causing it to go back into the system so that government money would be disbursed for it, he stole the money.

The military judge instructed the members in accordance with the government's apparent theory of prosecution that they must find that the appellant caused and counseled Mr. X to "obtain" government funds for use in paying improper personal expenses when he wrote the BSI check to American Express.

The appellant asserts that (1) given the nature of the funds advanced to him for operational purposes, he cannot be guilty of larceny of the funds under any applicable theory of larceny; (2) even if the government had a superior right to possession of the funds sufficient to support a prosecution for larceny, the members were erroneously instructed by the military judge; and, (3) in any event, the evidence is insufficient to establish the wrongfulness or criminal intent with respect to the appellant's conduct, or to disprove the appellant's defense of honest mistake of fact.

The appellant also argues that the absence of a fiduciary relationship between himself and the government renders a theory of wrongful taking based on a holding of the funds as a fiduciary inapplicable to the facts of his case, assuming the government had sufficient property interest in the funds to qualify as an "owner." *See United States v. Haskins*, 29 C.M.R. 181 (C.M.A.1960). Here it would appear that a theory of wrongful withholding by a failure to account for the funds when an accounting is due is not supported by sufficient evidence, because it appears no accounting was due at the time in question.

The government's apparent theory of the case did not dispute the appellant's assertion that his use of the credit card was authorized or otherwise lawful. Thus, the government tacitly conceded this mixed issue of law and fact. Under these exceptional circumstances, although there may have been a breach of fiduciary duty by the

---

28. Similar credit cards were issued in the names of other individuals.

29. There was some evidence to the contrary. Lieutenant Colonel (LTC) Frederick Byard testified under a grant of immunity that he was "briefed" that these cards were to be treated as if they were government credit cards and could be used for personal purposes "[o]nly in ex- treme emergencies or situations that you couldn't get yourself out of." LTC Byard was convicted in a case related to the one at bar. *See United States v. Byard,* 29 M.J. 803 (A.C.M.R. 1989) (findings of guilty and sentence set aside and all but one charge was dismissed with authority to order a rehearing thereon).

appellant, assuming such a duty existed, we find insuffi... evidence to allow the members to find beyond a reasonable doubt that the appellant possessed the criminal intent to convert or steal government property, and that the appellant was required to account for the funds at the time in question. Accordingly, the evidence is insufficient that the appellant knowingly and purposely exercised control over the funds in question in such a manner that a serious interference with the rights of the government would result.

On the basis of the errors noted the findings of guilty and the sentence are set aside. The charges are dismissed.

Judge WERNER and Judge GRAVELLE concur.